**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Terrance D. BROWN, Defendant–
Appellant.**

**No. 97–5095.**

United States Court of Appeals,
Sixth Circuit.

Argued April 29, 1998.

Decided June 8, 1998.

Howell G. Clements (argued and briefed), Spears, Moore, Rebman & Williams, Chattanooga, TN, for Defendant–Appellant.

Richard A. Quaresima (argued and briefed), Lawrence Hodapp (briefed), Federal Trade Commission, Washington, DC, John P. MacCoon, Asst. U.S. Attorney (briefed), Office of the U.S. Attorney, Chattanooga, TN, for Plaintiff–Appellee.

Before: KENNEDY, CONTIE, and ' MOORE, Circuit Judges.

## OPINION

MOORE, Circuit Judge.

Defendant–Appellant Terrance Daniel Brown appeals his conviction and sentence, following a jury trial, for conspiracy and wire and mail fraud in connection with a telemarketing scheme. For the reasons that follow, we affirm.

## I. BACKGROUND

Continental Distributing Company ("CDC") was a telemarketing company based in Chattanooga, Tennessee. The company targeted its telemarketing schemes at elderly people because the elderly tend to be most vulnerable to the various telemarketing tricks and ploys used by CDC.[1] J.A. at 259–60 (Craig W. Heaps, Pres. of CDC, Test.). The company operated a one-in-four scheme whereby a telemarketer would call a victim and tell the victim that she had won one of four fabulous awards. J.A. at 230–31. The awards were usually stated in order of the least expensive to the most expensive. J.A. at 250 (Heaps Test.). For example, the telemarketer, when speaking to a potential victim, would list the awards in the following order: a 1994 car, a speed boat, the open

---

1. Ninety-nine percent of the calls CDC made were to people over the age of 60, and ninety percent of the calls were made to people over the age of 70. J.A. at 259 (Heaps Test.).

award, and cash. The telemarketers purposely listed the awards in this manner to disguise the fact that the "open award" (also known as the "gimmie") was worth substantially less than the other awards. J.A. at 234. Typically, the open award was a very inexpensive piece of merchandise such as a lithograph, JFK coin set, or cheap sculpture. J.A. at 232; 250; 453 (Product List).

The object of the scheme was to convince the victim that she had won some really fabulous award and then get the victim to pay substantially more for the award than CDC had paid for it.[2] J.A. at 265. In fact, CDC would deduct the cost of the award, known as the "pad," from the commission of the telemarketer. J.A. at 232. For example, a telemarketer would tell the elderly victim that she had won one of four great awards and then try to convince her to send CDC a large amount of money for the award (often as much as $15,000 or more). If the victim sent the money, then the telemarketer would ensure that the victim received a sculpture for which CDC might have paid $200. The owners of CDC would then deduct the $200 from the sales price and the telemarketer would receive a commission on $14,800 ( $15,000 minus the $200). Thus, telemarketers at CDC had a great incentive to provide victims with cheap merchandise rather than a car, motor home, sail boat, or some other expensive award. This was so because the more expensive the award, the less commission the telemarketer would receive on the money sent by the victim to CDC. J.A. at 295 (Jeffrey J. Hutchinson, a CDC employee, Test.).

Telemarketers at CDC did not have much to worry about because the odds were three in three thousand that a victim would win a major award; that is, 2,997 victims would definitely receive the open award, and the open award could be any cheap item the telemarketer wanted it to be. J.A. at 179 (Brown Test.); 295 (Hutchinson Test.). In addition to the open award, CDC also sent victims a "mixed box of products," which were essentially worthless trinkets or products like letter openers, space pens, and fris-

bees. Accordingly, CDC made its money sending open awards and the mixed box of products to victims in exchange for enormous sums of money by convincing the victims that they had a real chance at winning a house or car.

CDC found its victims, often referred to as "mooches," by buying what were known as "leads" lists from lead brokers in Las Vegas. J.A. at 238; 266 (Heaps Test.). Additionally some telemarketers, such as Brown, brought leads lists with them to CDC. Those leads lists contained the names of elderly people who had previously purchased products over the telephone from another company, usually spending large amounts of money to do so. CDC, like most telemarketing companies, organized its telemarketers into "fronters" and "reloaders." J.A. at 293–94. The fronters called the leads, told them about the one-in-four promotion and that they had been selected as winners. On the first call, the fronters normally pushed to have the customers send in an amount under $1000 in exchange for the open award which would be a lithograph or coin set that only cost CDC $50 to purchase.[3] Once the fronter sold the customer, the fronter would then pass the lead card containing the customer's information (address, telephone number, what the person had purchased, and sales price) on to the reloader. J.A. at 238–40 (Heaps Test.). The reloader would then call the victim and try to sell them again and again on succeeding promotions for larger and larger amounts of money until the victim was totally without funds. J.A. at 298 (Hutchinson Test.).

Brown joined CDC as a reloader in January of 1994 and worked there until October of 1994. J.A. at 328 (Kennedy Test.). Brown had accumulated a wealth of experience as a reloader from having worked eight years in the telemarketing industry at companies using fraudulent schemes comparable to the one used by CDC. J.A. at 176–78 (Brown Test.). In fact, Brown was proud of the fact that he had been the top reloader at almost every company where he had worked.

---

**2.** For example, one victim received 130 space pens and other miscellaneous items for $21,000. J.A. at 277.

**3.** For awards under $50, CDC did not deduct this cost from a telemarketer's commission.

J.A. at 213 (Brown Test.). Things were no different at CDC where he quickly rose to become the top reloader, generating over $443,209 in the nine months he worked at CDC. J.A. at 327–28 (Kennedy Test.).

Brown also operated his own telemarketing company known as "Smokey Mountain Distributing" ("SMD"). J.A. at 147 (Brown Test.). SMD was a one-person operation, but the object was the same: Brown focused on elderly leads who had previously purchased products over the telephone and thus were especially vulnerable to his nefarious tactics. J.A. at 337–38 (Kennedy Test.).

In January of 1995, a telemarketing task force comprised of the Federal Bureau of Investigation, Internal Revenue Service, Secret Service, and local law enforcement raided CDC's operations and closed it. J.A. at 323 (Kennedy Test). Six people, including Brown, were eventually indicted for conspiracy, wire fraud, mail fraud, use of fictitious name, and money laundering. Also, the government moved to forfeit assets. J.A. at 32 (Indictment). Everyone pleaded guilty except Brown, who demanded and received a jury trial.

Prior to his trial, but while under indictment, Brown continued to operate SMD, although he had ostensible employment as a salesperson for Advanced Cellular and Paging. J.A. at 174; 388–91, 398 (Burns Test.). Based on a tip from a confidential informant, an FBI agent obtained a search warrant for Brown's home. J.A. at 393 (Burns Test.). The task force executed the search warrant and found numerous materials indicating that Brown had been operating a fraudulent telemarketing agency from his home. Subsequently, Brown filed a motion to suppress the evidence found in his home, a motion the court denied. J.A. at 108 (Mot.); 79 (Mem. and Order).

At trial, two of Brown's co-conspirators and several of his victims testified against him. Nevertheless, at the close of the government's case, Brown moved for a judgment

of acquittal, which the district court denied. J.A. at 416. The jury convicted Brown on all of the counts in the indictment for which he was charged. J.A. at 140 (Verdict Form). The district court sentenced him to 120 months' incarceration (including a two-level upward departure and a three-level enhancement), three years' supervised release, $450 special assessment, and $2,677,161.68 in restitution. J.A. at 82–89 (Judgment in a Criminal Case).

After his sentencing, Brown filed a timely notice of appeal. On appeal, Brown raises the following five issues: (1) the district court improperly admitted evidence of Brown's activities at SMD under Federal Rule of Evidence 404(b); (2) the district court erred in failing to suppress the evidence found at Brown's home; (3) the district court improperly imposed a two-level upward departure and a three-level enhancement in sentencing Brown; (4) the district court erred in denying Brown's motion for a judgment of acquittal on the mail fraud count of the indictment; and (5) there was insufficient evidence to support the guilty verdict.

## II. ANALYSIS

### A. *Federal Rule of Evidence 404(b)*

Brown argues that, under Federal Rule of Evidence 404(b), the district court erred in admitting evidence concerning the following: (1) his activities at SMD and other telemarketing agencies; (2) conversation between Brown and Dorothy Schlaikjer, one of his victims at SMD; and (3) IRS agent Scott Kennedy's testimony regarding Brown's activities at Quality Home Health Care, a telemarketing concern, which were outside of the indictment's time frame.

■ In reviewing a district court's decision to admit evidence of "other crimes, wrongs, or acts" under Rule 404(b), we first review for clear error the district court's factual determination that the other acts occurred.[4]

4. Federal Rule of Evidence 404(b) provides:
(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecu-

Second, we examine de novo the district court's legal determination that the evidence was admissible for a legitimate purpose. Finally, we review for abuse of discretion the district court's determination that the probative value of the other acts evidence is not substantially outweighed by its unfairly prejudicial effect. *United States v. Myers,* 123 F.3d 350, 362–63 (6th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 611, 139 L.Ed.2d 498 (1997).

 Brown does not challenge that the other acts occurred. Instead, he raises challenges to the second and third prongs. Brown was convicted of violations of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), and 1343 (wire fraud). The elements of mail fraud are: (1) a scheme to defraud, and (2) use of the mails in furtherance of the scheme. *United States v. Smith,* 39 F.3d 119, 121 (6th Cir.1994) (citing *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). The prosecution must prove that the defendant possessed the *specific intent* to deceive or defraud in order to convict him; the issue of fraudulent intent is an issue reserved for the trier of fact. *Id.* at 121–22. The elements of wire fraud are: (1) scheme to defraud, and (2) use of an interstate electronic communication in furtherance of the scheme. *Id.* at 122 (citing *United States v. Morelli,* 643 F.2d 402, 411–12 (6th Cir.), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)). The government bears the responsibility of proving *specific intent* to defraud. *Id.* The district court determined that Brown's activities at SMD (including the conversation with Dorothy Schlaikjer), Quality, and the other telemarketing agencies all went to intent. J.A. at 330, 333, 335, and 374.

 The district court properly admitted this evidence under Rule 404(b) to show Brown's specific intent on the mail and wire fraud charges. We have held that "where there is thrust upon the government, either by virtue of the defense raised by the defendant or by virtue of the elements of the crime charged, the affirmative duty to prove that the underlying prohibited act was done with a specific criminal intent, other acts evidence may be introduced under Rule 404(b)." *United States v. Myers,* 123 F.3d at 363 (quotation omitted). In this case, not only did the government have the affirmative duty to prove specific intent, but Brown defended by arguing that he had no intent to defraud. *See* J.A. at 166, 168, 170, 173 (Brown Test.). Moreover, Brown's attorney admitted that because he argued that Brown was a legitimate salesman who left it up to CDC's owners and managers to ensure that the customers received the appropriate merchandise, the government could introduce evidence from SMD to show that Brown was defrauding people on his own. J.A. at 329. Thus, the district court correctly admitted the evidence for a proper purpose.

 As for the third prong, the district court found that the probative value of the evidence outweighed its prejudicial effect. As previously noted, we review this finding for abuse of discretion. In conducting this review, we consider (1) whether the other act evidence was unduly prejudicial; (2) the availability of other means of proof; (3) when the other acts occurred; and (4) whether the district court gave a limiting instruction. *See Myers,* 123 F.3d at 363–64. Here, the other acts evidence was not unduly prejudicial. As the district court noted, these were just additional calls. J.A. at 375. *See Myers,* 123 F.3d at 363 (evidence of other drug sales not prejudicial because they are simply other sales). There was no alternative for the government to prove intent other than through telephone calls that Brown made at CDC and elsewhere to show similarity of the sales pitches, the promotional schemes, and other actions that indicate Brown had the specific intent to defraud people when he worked at CDC. Furthermore, the district court found that the other acts were closely related in time to and in some cases overlapped the activity charged in the indictment. J.A. at 343. Finally, each time such evidence was introduced, the district court gave a special instruction. J.A. at 353–54; 375–76.

tion in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause

shown, of the general nature of any such evidence it intends to introduce at trial.

This record amply demonstrates that the district court did not abuse its discretion in concluding that the probative value of the other acts evidence outweighed its prejudicial effect. Accordingly, because the district court's decision to admit this evidence under Rule 404(b) satisfies all three prongs of the test, this assignment of error fails.

## B. *Denial of Motion to Suppress*

 When reviewing decisions on motions to suppress, this court will uphold the factual findings of the district court unless clearly erroneous, while legal conclusions as to the existence of probable cause are reviewed de novo. *United States v. Leake*, 998 F.2d 1359, 1362 (6th Cir.1993). In *Illinois v. Gates*, the Supreme Court established that a warrant must be upheld as long as the "magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing...." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)· (quotation omitted); *United States v. Pelham*, 801 F.2d 875, 877–78 (6th Cir. 1986), *cert. denied*, 479 U.S. 1092, 107 S.Ct. 1305, 94 L.Ed.2d 160 (1987). This court pays great deference to the determinations of probable cause made by a magistrate, whose findings "should not be set aside unless arbitrarily exercised." *Pelham*, 801 F.2d. at 877 (quotation omitted).

In a case involving an anonymous tip, the *Gates* Court established a "totality of the circumstances" test for determining probable cause: "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." 462 U.S. at 238, 103 S.Ct. 2317.

 The affidavit in this case meets that test. J.A. at 115–17. Special Agent Earl Burns of the FBI had conducted investigations into telemarketing fraud for the previous four years. He knew that a grand jury had indicted Brown on mail and wire fraud charges in connection with telemarketing activities. He also knew that Brown had worked at several other telemarketing agencies that had been investigated by law enforcement, including one in Chattanooga, Tennessee. A cooperating witness ("CW") provided information that Brown was renting a residence at a certain street address and working at Advanced Cellular in Chattanooga, all of which the agent verified. The CW observed, firsthand, that Brown had two telephone lines with caller identification boxes and separate answering machines, had lead sheets scattered about (with dollar amounts of prior illegal telephone sales next to each victim's name), and held himself out as being "self-employed" doing business as SMD. The CW also provided, and Burns confirmed, information that Brown maintained three post office boxes for SMD and used a false social security number in his business dealings. From this information, having verified most of what the CW told him, and based on his four years of investigating telemarketing fraud, Burns concluded that Brown's SMD had all of the indicia of a "rip and tear" operation whereby the person operating the business simply convinces people to send him money in exchange for some award or prize and never sends them anything. This kind of a business necessarily relies on anonymity, hence utilizing caller identification boxes, a fake social security number, and post office boxes.

A practical, common-sense reading of this affidavit based on the totality of the circumstances, including the veracity and basis of knowledge of the person supplying the information, compelled the conclusion that there was a fair probability that contraband or evidence of a crime would be found at Brown's home. Accordingly, probable cause existed for issuance of the search warrant, and the district court properly denied Brown's motion to suppress.

 Even if we were to conclude that the affidavit did not provide probable cause for the search of Brown's residence, we would uphold the search under the Supreme Court's holding in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon*, the Supreme Court held that the exclusionary rule "should be modified so as not to bar the admission of

evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905, 104 S.Ct. 3405. Only where the evidence is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," will the evidence be suppressed. *Id.* at 923, 104 S.Ct. 3405 (quotation omitted). There is nothing in the affidavit that suggests that it was wholly deficient so that Agent Burns's reliance on it could be said to be "entirely unreasonable." Thus, the district court properly declined to suppress the evidence found in Brown's home.

### C. *Relevant Conduct, Enhancement, and Upward Departure*

■■■■ We review the district court's factual determinations at sentencing for clear error, but we review de novo the district court's interpretation of the United States Sentencing Guidelines ("U.S.S.G."). *United States v. Flowers*, 55 F.3d 218, 220 (6th Cir.), *cert. denied*, 516 U.S. 901, 116 S.Ct. 261, 133 L.Ed.2d 185 (1995). First, Brown challenges the amount of sales the district court included as relevant conduct in sentencing him. The district court included the total sales for the time Brown worked at CDC—$2,677,000, and included additional $1,173,647 in sales for Brown's work at other companies. J.A. at 420–23; 57.[5] It is clear under U.S.S.G. § 1B1.3(a)(1)(B) that a conspirator is liable for the acts and omissions of his co-conspirators that are reasonably foreseeable and in furtherance of the conspiracy. *See United States v. Sanders*, 95 F.3d 449, 454–55 (6th Cir.1996).

■■■■ In this case, the total loss was reasonably foreseeable to Brown because CDC's salespeople had access to each other's sales logs. J.A. at 581. Furthermore, Brown occasionally led sales meetings at CDC, the obvious purpose of which was to increase "sales," i.e., the loss to the victims of the telemarketing scheme. J.A. at 308. Brown

also created a particular promotion for all salespeople to use, the purpose of which was to generate more victims and more revenue, i.e., loss to the victims. J.A. at 310–11. Therefore, the total loss for the time Brown worked at CDC was reasonably foreseeable to him.

■■■■ Brown also challenges the inclusion of additional sales from the previous companies where he worked as relevant conduct in this case. Relevant conduct includes acts "that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* at commentary, applic. note 9(A). The testimony is clear that Brown worked at several telemarketing agencies, including his own, that had the same *modus operandi* and purpose. J.A. at 176–78; 302–03; 307. Brown took the same leads with him from job to job and victimized the same people on several occasions. J.A. at 244–45; 306–07; 347–50; 564 (Repeat Victim List). Thus, the district court properly included the additional amounts from the other telemarketing agencies as relevant conduct.[6]

■■■■ Second, Brown challenges the district court's imposition of a three-level enhancement for his role in the offense under U.S.S.G. § 3B1.1(b). When "an enhancement provision is contested, the government bears the burden of establishing the enhancement factors by a preponderance of the evidence." *United States v. Feinman*, 930 F.2d 495, 500 (6th Cir.1991). A district court's factual finding under § 3B1.1 is subject to review for clear error. *Id.* U.S.S.G. § 3B1.1(b) provides: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved

---

5. Brown's attorney does not contest these numbers. J.A. at 423.

6. Under U.S.S.G. § 2F1.1(b)(1)(N), the district court added 13 levels to Brown's sentence because the amount of the loss was between

$2,500,000 and $5,000,000. Thus, the additional $1,173,647, which brought the total loss to approximately $3,800,000, did not affect Brown's sentencing guideline range.

five or more participants or was otherwise extensive, increase by 3 levels." (emphasis in original). "To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." Commentary, applic. note 2. Even if the defendant did not organize, lead, manage or supervise, he may still qualify for an upward departure if he "nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." Id.

■ Here, the government met its burden, and the district court did not commit clear error in so finding. Brown does not dispute that the criminal activity at CDC involved five or more people or that it was extensive. Brown trained other salespeople by occasionally running sales meetings when CDC's president was absent. J.A. at 307–08 (Hutchinson Test.). Brown authored an advertisement using his own name to attract new salespeople to the organization. J.A. at 268 (Heaps Test.). Brown created a new promotion for the company to use which was designed to solicit new victims. J.A. at 310–11 (Hutchinson Test.). Brown also helped rig a drawing from one promotion in order to keep the FBI at bay when a potential victim complained. J.A. at 272–73 (Heaps Test.). All of these activities demonstrate by a preponderance of the evidence that Brown was more than a mere participant in the scheme, but rather assumed a managerial role over one or more other participants. *See United States v. Kraig,* 99 F.3d 1361, 1369 (6th Cir.1996) (three-level increase appropriate for managerial role where the defendant helped recruit people into the scheme and rendered other substantial assistance in furtherance of the scheme).

■ Third, Brown complains that the district court improperly imposed a two-level upward departure in sentencing him, and that this departure was motivated by the fact that he decided to go to trial while his co-conspirators all pleaded guilty. We review for abuse of discretion a district court's decision to depart upward. *See, e.g., United States v. Dobish,* 102 F.3d 760, 763 (6th Cir.1996) (quoting *Koon v. United States,* 518

U.S. 81, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996)). A district court abuses its discretion when it commits an error of law in the interpretation or application of the guidelines. *United States v. Wright,* 119 F.3d 390, 392 (6th Cir.1997).

■ U.S.S.G. § 5K2.0 and 18 U.S.C. § 3553(b) allow a district court to impose a sentence outside of the applicable guideline range if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the ... guidelines that should result in a sentence different from that described." Section 5K2.0 (quoting 18 U.S.C. § 3553(b)). The district court provided five reasons for departing upward in this case: (1) the number of victims, 336, because U.S.S.G. § 2F1.1(b)(2)(B) does not adequately take into account such a large number of victims; (2) the financial and psychological damage that Brown inflicted upon his victims; (3) the fact that he continually "reloaded" his victims; (4) Brown showed no remorse and did not think he did anything wrong; and (5) the Senior Citizens Against Marketing Scams Act of 1994 ("SCAMS"), 18 U.S.C. §§ 2325–2327 manifests Congress's view that the Guidelines do not adequately punish defendants who target the elderly. J.A. at 444–46 (Sentencing Hr'g).

Brown focuses on the SCAMS Act factor, arguing that the Guidelines already adequately punish his conduct as reflected in the relevant conduct, role in the offense, and vulnerable victim guidelines. The SCAMS Act came into effect on September 13, 1994. It provides as follows:

A person who is convicted of an offense under section 1028, 1029, 1341, 1342, 1343, or 1344 in connection with the conduct of telemarketing—

(1) may be imprisoned for a term of up to 5 years in addition to any term of imprisonment imposed under any of those sections, respectively; and

(2) in the case of an offense under any of those sections that—

(A) victimized ten or more persons over the age of 55; or

(B) targeted persons over the age of 55, may be imprisoned for a term of up to 10 years in addition to any term of imprisonment imposed under any of those sections, respectively.

18 U.S.C. § 2326. Congress passed the SCAMS Act because "[m]any Americans, but particularly older men and women, have been targeted and victimized by illicit telemarketers. Some of these seniors are victimized repeatedly, losing large amounts of their hard earned savings." 139 CONG. REC. S10015–01, *S10016 (daily ed. July 30, 1993) (Purpose of the SCAMS Act). Accordingly, the Act "criminaliz[es] telemarketing fraud and enhances penalties for these crooked acts when senior citizens are the principal victims." 139 CONG. REC. S15146–01, *S15148 (daily ed. November 5, 1993) (statement of Senator Hatch). Given the purpose of the SCAMS Act, there is simply no support for Brown's argument that the relevant conduct and role in the offense guidelines adequately address his fraudulent conduct so as to proscribe an upward departure in this case.

Brown also challenges the upward departure on the grounds that the vulnerable victim guideline, § 3A1.1(b), adequately addresses his conduct in this case. In *United States v. Smith*, 133 F.3d 737 (10th Cir.1997), cert. denied —— U.S. ——, 118 S.Ct. 2306, 141 L.Ed.2d 165 (1998), the Tenth Circuit considered and rejected a similar argument in a case involving a telemarketing scheme very similar to the one engaged in by Brown. After Smith's convictions for wire and mail fraud, the Tenth Circuit rejected a challenge to the upward departure on the grounds that the guidelines for vulnerable victim, U.S.S.G. § 3A1.1(b), and multiple victims, U.S.S.G. § 2F1.1(b)(2)(B), adequately addressed his conduct, holding that

> The foci of the vulnerable victim enhancement and the SCAMS Act differ on two key dimensions. The SCAMS Act is directed toward criminal telemarketing conduct targeted at or actually victimizing a certain class of individuals, statutorily defined as those over the age of fifty-five. The Act requires the offense target the elderly as a class. In contrast, the vulnerable victim enhancement does not require a finding the defendant targeted the victim because of his vulnerability. Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged. A single vulnerable victim is sufficient to support application of the enhancement. Thus, the focus of the SCAMS Act and that of the vulnerable victim enhancement differ in key respects and are sufficiently distinct to avoid double counting the same offense conduct.

*Id.* at 749 (citations omitted).

We agree with the analysis of the Tenth Circuit. The SCAMS Act is specifically designed to combat and punish severely the conduct in which Brown engaged, conduct which falls outside of the "heartland" of cases addressed by the vulnerable victim guideline, U.S.S.G. § 3A1.1(b). In this case, the SCAMS Act authorized the district court to impose an additional ten-year sentence upon Brown. Instead of imposing a ten-year sentence under the SCAMS Act, the district court noted that the SCAMS Act signaled Congress's view that U.S.S.G. § 3A1.1(b) did not adequately address Brown's conduct. Accordingly, the district court used the SCAMS Act as a basis for merely departing upward by two levels, increasing Brown's Guidelines range from 78–97 months to 97–121 months.

We conclude that the district court could properly depart upward based on the SCAMS Act even though Brown also received a two-level enhancement for vulnerable victims under § 3A1.1(b). As noted in the *Congressional Record*, "older Americans are increasingly targeted and victims of these scams.... Telemarketers [target the elderly] because the elderly are easily accessible by phone, usually intent on enlarging their savings for the benefit of grandchildren; often less suspicious, sometimes possess poor memories, and usually too embarrassed to inform family or law enforcement once they recognize the deceit." 139 CONG. REC.

S10015–01, *S10016 (daily ed. July 30, 1993). Then–Senator William S. Cohen (R–Me.) remarked, "[w]e heard compelling testimony from elderly victims who had lost significant portions of their life savings to con artists. These scams take a variety of forms such as prize giveaway schemes which dupe consumers into purchasing merchandise or paying handling fees with the promise that they will receive substantial cash awards or other valuable prizes. Of course, the prize never materializes and the customer's money is long gone." *Id.* at *S10017. The SCAMS Act speaks directly to Brown's reprehensible conduct, and the district court properly gave him an additional two years in prison to think about it.

With respect to Brown's claim that his sentence was enhanced because he chose to go to trial, there is simply no evidence in the record to support that claim. *See, e.g., United States v. Frost,* 914 F.2d 756, 774 (6th Cir.1990) (rejecting a similar claim because nothing in the record supported the defendants' claims). However, there is ample evidence that Brown engaged in fraudulent telemarketing schemes for eight years, took leads with him to each new location, repeatedly victimized the same individuals, and took pride in being the top "reloader" at each fraudulent telemarketing location. This is the record evidence upon which the district court relied in sentencing Brown. There is nothing in the record that indicates that the district court considered Brown's decision to go to trial in fashioning Brown's sentence. Accordingly, this claim of error fails.

### D. *Denial of Rule 29 Motion*

■ Brown argues that the district court should have granted his motion for a judgment of acquittal at the close of the government's case on the mail fraud count, Count 54, on which he was ultimately convicted. Brown relies on the fact that the alleged fraudulent mailing occurred after his departure, and he argues he could not be held liable for it. *Id.* The elements of mail fraud are: (1) a scheme to defraud; and (2) use of the mails in furtherance of the scheme. *United States v. Smith,* 39 F.3d 119, 121 (6th Cir.1994) (citing *Pereira v. United States,*

347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). We review a denial of a motion for judgment of acquittal by considering the evidence in the light most favorable to the prosecution. *See United States v. Reed,* 821 F.2d 322, 324 (6th Cir.1987).

■ On November 14, 1994, CDC mailed a bond to Ethelyn Henrich based, in part, on the conversations she had with Brown. J.A. at 556–58; 529, 531–32. The bond had a face value of $3000, but it did not mature until the year 2014, so its value in 1994 was $300. J.A. at 540–41. Brown had represented to Henrich that the bond was currently worth $3000. J.A. at 529, 531–32. By so doing, he clearly was a part of the scheme to defraud. Therefore, the only issue is use of the mails in furtherance of the scheme. A defendant may commit mail fraud even if he personally has not used the mails. *See United States v. Griffith,* 17 F.3d 865, 874 (6th Cir.), *cert. denied,* 513 U.S. 850, 115 S.Ct. 149, 130 L.Ed.2d 89 (1994). A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails. *See United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1988) (citing *Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 98 L.Ed. 435 (1954)). "In sum, the 'mailing need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.'" *Id.* (quoting *United States v. Silvano,* 812 F.2d 754, 760 (1st Cir.1987)).

■ In this case, Brown knew that the bond would be mailed to Henrich because it was closely related to and a reasonably foreseeable consequence of his actions inducing her to send $3000 to CDC in order to get the bond. Indeed, Jeffrey J. Hutchinson, a fellow telemarketer at CDC, testified that the bond scheme was a "gimmie" or "open award." J.A. at 309. He further testified that he and Brown used to joke about how worthless the gimmies were. Finally, he testified that Brown was the primary user of the bond scheme. Thus, under the foregoing test, Brown could be held liable for the mailing of the bond even though he had left the company by the time it was mailed. *See also*

*United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1104 (7th Cir.1979) (withdrawal from conspiracy did not shield defendants from mail fraud convictions based on items mailed after they withdrew because the mailings were the "virtually inevitable results" of their earlier actions). Accordingly, the district court did not abuse its discretion in denying Brown's motion for judgment of acquittal on the mail fraud count.

### E. Sufficiency of the Evidence

 On appeal, we review a challenge to the sufficiency of the evidence by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime." *United States v. Jones,* 102 F.3d 804, 807 (6th Cir. 1996) (quotation omitted). Circumstantial evidence alone is sufficient to sustain a conviction, and such evidence need not "remove every reasonable hypothesis except that of guilt." *Id.* (internal quotation omitted).

 Brown was convicted of conspiracy in violation of 18 U.S.C. § 371, wire fraud in violation of 18 U.S.C. § 1343, and mail fraud in violation of 18 U.S.C. § 1341. As previously explained, the government met its burden of proof on the mail fraud conviction. Similarly the government met its burden on the wire fraud counts. The elements of wire fraud are: (1) scheme to defraud, and (2) use of an interstate electronic communication in furtherance of the scheme. *United States v. Smith,* 39 F.3d at 122 (citing *United States v. Morelli,* 643 F.2d 402, 411–12 (6th Cir.), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981)). There clearly was a scheme to defraud, about which both Hutchinson and Heaps testified, and in which Brown participated. J.A. at 233, 235, 259, 295, 300, 309, 313–14, 315, 316. This a telemarketing scheme, so there is no question that the telephone was used in furtherance of the scheme. The government has tapes of Brown calling Elsie Clark, who lives in Oregon, to try to entice her into sending $15,000 to CDC in furtherance of the scheme. J.A. at 463–495. Thus, there is sufficient evidence of wire fraud.

 Finally, the government met its burden of proof on the conspiracy count of the indictment. Under 18 U.S.C. § 371, the government must prove the following:

(1) the conspiracy described in the indictment was wilfully formed, and was existing at or about the time alleged; (2) that the accused willfully became a member of the conspiracy; (3) that one of the conspirators thereafter knowingly committed at least one overt act charged in the indictment at or about the time and place alleged; and (4) that such overt act was knowingly done in furtherance of some object or purpose of the conspiracy as charged.

*United States v. Kraig,* 99 F.3d 1361, 1368 (6th Cir.1996).

 Viewing the evidence in the light most favorable to the government, we hold that the evidence overwhelmingly supports Brown's conviction for conspiracy. Brown's co-conspirators Heap and Hutchinson testified as to the willful formation of the conspiracy with the intent to defraud elderly people. J.A. at 233–236; 259; 316. Brown willingly joined this conspiracy having worked at several similar types of companies in the past. J.A. at 176–78; 455–56 (Employment Application). All of the conspirators, including Brown, undertook overt acts as charged in the indictment by calling elderly people, misleading them, and taking their money. J.A. at 224–227; 358–59; 378–79; 536–38. From the testimony there is no doubt that all of these acts were knowingly undertaken in furtherance of the object of the conspiracy.

### CONCLUSION

Having rejected all of Brown's challenges to his conviction and sentence, we **AFFIRM** the judgment of the district court.