### UNITED STATES of America, Plaintiff–Appellee,

v.

### Everton JONES and Lori Peairs, Defendants–Appellants.

No. 99–4147, 99–4236.

United States Court of Appeals, Sixth Circuit.

May 14, 2001.

---

* The Honorable Peter C. Economus, United States District Judge for the Northern District of Ohio, sitting by designation.

Before COLE and GILMAN, Circuit Judges; ALDRICH, District Judge.*

RONALD LEE GILMAN, Circuit Judge.

Everton Jones and Lori Peairs pled guilty in 1998 to participating, along with nine other codefendants, in a drug and money-laundering conspiracy. The district court sentenced Jones, who pled guilty without a plea agreement, to 60 months of incarceration and to an equal term of supervised release. Pursuant to Peairs's guilty plea and written plea agreement, Peairs was sentenced to 46 months of imprisonment and to 2 years of supervised release. Jones and Peairs now appeal, challenging their sentences on various grounds. For the reasons set forth below, we AFFIRM the judgment of the district court on all issues other than Peairs's sentence enhancement for laundering over $200,000 in drug money. As

---

* The Honorable Ann Aldrich, United States District Judge for the Northern District of Ohio, sitting by designation.

to the money-laundering enhancement, we VACATE and REMAND Peairs's sentence for further factual determinations on the scope of her relevant conduct.

## I. BACKGROUND

### A. Factual background

On April 28, 1998, several Columbus Police Department (CPD) detectives executed search warrants that resulted in the seizure of seven boxes sent to various addresses in central Ohio from a Mail Boxes, Etc. office in Mar Vista, California. The seven boxes contained a total of 52 pounds of marijuana. United Parcel Service (UPS) records of similar shipments ultimately disclosed that more than 90 such boxes had been sent between October of 1997 and May of 1998. The focus on the seven boxes was the result of an investigation conducted by a multi-agency task force, including agents from the CPD, the Zanesville Police Department, the Internal Revenue Service–Criminal Investigation Division (IRS–CID), the United States Customs Service, and the Los Angeles Police Department (LAPD).

The investigation began in the spring of 1998, when UPS representatives in Columbus, Ohio contacted the police after noticing that a large volume of boxes were being shipped to various addresses in Zanesville, Ohio by next-day delivery, a method they had often seen used by drug traffickers to evade traditional drug-enforcement efforts. At the same time, the IRS–CID and the U.S. Customs Service had been investigating interstate shipments of marijuana. These agencies had received information that at least 90 boxes of marijuana had been delivered from a Mail Boxes, Etc. office in Mar Vista to Zanesville, and that a large volume of Western Union wire transfers had often preceded or followed the receipt of the express-mail deliveries.

As part of the multi-agency investigation, LAPD narcotics detectives obtained permission from the Mail Boxes, Etc. store in Mar Vista to monitor the store and examine selected boxes on April 27, 1998. That day, they saw Jones drop off eight boxes for shipment, four of them to Columbus, three of them to Zanesville, and one to a non-Ohio location. An examination of the boxes by a trained narcotics dog indicated that the boxes contained drugs. The LAPD detectives then contacted the CPD detectives to inform them about the nature of the shipment, thus allowing the latter to monitor and seize the boxes upon delivery in Ohio.

On the same day, the LAPD detectives followed Jones to a residence located at 1703 South Stanley Avenue in Los Angeles. There, they saw him using a key to enter the residence. The LAPD narcotics bureau executed a search warrant for the South Stanley Avenue address on May 6, 1998. Prior to entering the building, they had seen Jones arrive at the residence in an automobile. Jones was carrying a bag containing what appeared to be block-shaped items, and was admitted into the building by Marie Johnson. Another man, Balfour Burrell, was admitted a short time later, also carrying a bag.

When the detectives entered the residence pursuant to the warrant, they found Jones hiding under a bed in one of the bedrooms. They also discovered a 0.22 caliber semi-automatic pistol in the pocket of a jacket that was hanging on the bedroom door, as well as a loaded ammunition clip in another pocket of the jacket. A bill for telephone service was found by the detectives that listed Jones as the subscriber for the South Stanley Avenue address. Further investigation showed that Jones was registered as the subscriber for that address since December of 1997,

which is when Johnson began renting the residence. He later acknowledged that he had lived with Johnson even prior to that time.

A search by the detectives uncovered approximately 20 pounds of marijuana and various items used to prepare the marijuana for shipment, such as cling wrap and spray glue. Within the building, the detectives also found documents listing addresses for locations within central Ohio that had received boxes suspected of containing marijuana, including those involved in the April 28, 1998 shipment.

During the concurrent investigation of the Western Union wire transfers involved in this case, the IRS–CID and the U.S. Customs Service determined that all but one of the transfers had been collected at J.R.'s Liquors in Lenox, California, a suburb of Los Angeles. The agencies also found that 238 of the wire transfers, involving more than $479,000, were sent during the period covered in the indictment—from October 1, 1997 to May 6, 1998—and that at least 91 of the transfers, involving $229,400, were sent from Zanesville.

Ten of the transfers from Zanesville, involving $23,500, were personally wired by Peairs. The government alleges that Peairs also received three of the boxes that contained marijuana. Peairs, however, adamantly denied ever receiving any of the boxes. She did admit, however, to driving three other codefendants—Redenna Burrell, India Goins, and Katina King—to make wire transfers. The amount of money wired by Burrell, Goins, and King during the trips in which Peairs accompanied them was $48,000, for a total of $61,500 wired by all four.

B. Procedural history

Jones and Peairs, as well as nine other codefendants, were each indicted on one count of conspiracy to possess with the intent to distribute over 100 kilograms of marijuana and on one count of conspiracy to commit money laundering. On February 18, 1999, Jones pled guilty to both counts without negotiating a plea agreement. During the preparation of the final Presentence Investigation Report, Jones lodged a written objection relating to the amount of marijuana attributable to him for the purpose of calculating his offense level. The government, in turn, filed a written objection to the draft Report's failure to include a two-level firearm enhancement. The final Report, and its accompanying objections, were transmitted to the district court.

At Jones's sentencing hearing, the district court overruled Jones's objection to the amount of marijuana attributable to him, but sustained the government's objection regarding the lack of a firearm enhancement. Subsequently, the district court sentenced Jones to 60 months of imprisonment for both counts and to an equal term of supervised release.

Peairs entered a guilty plea on March 24, 1999 to conspiracy to commit money laundering, pursuant to a written plea agreement. Under the plea agreement, the charge of conspiracy with intent to distribute marijuana was dismissed. She was sentenced to 46 months in prison and to 2 years of supervised release. In determining the length of her prison sentence, the district court included a two-level reduction for Peairs's acceptance of responsibility, but added a two-level enhancement because it held her accountable for $229,400 in wire transfers, this being the total amount of money transferred from Zanesville. The district court rejected Peairs's request to apply an additional level of reduction available under the U.S. Sentencing Guidelines when a defendant accepts responsibility for her offenses. It also refused to accept Peairs's contention

that her relevant conduct should be limited to less than the total amount of money transferred from Zanesville, based on her argument that she could not have reasonably foreseen the total amount involved.

## II. ANALYSIS

### A. Standard of review

A district court's interpretation of the sentencing guidelines is reviewed de novo. *See United States v. Sanchez*, 928 F.2d 1450, 1458 (6th Cir.1991). We will not, however, set aside a district court's findings of fact from a sentencing hearing unless the findings are clearly erroneous. *See United States v. Moored*, 38 F.3d 1419, 1423 (6th Cir.1994). District court determinations that are reviewed as findings of fact include whether an enhancement for possession of a weapon during a drug-distribution offense is warranted, *see United States v. Owusu*, 199 F.3d 329, 347 (6th Cir.2000), whether the quantity of drugs attributable to a defendant is appropriate, *see United States v. Charles*, 138 F.3d 257, 267 (6th Cir.1998), and whether a defendant is entitled to a downward adjustment for acceptance of responsibility, *see United States v. Childers*, 86 F.3d 562, 563 (6th Cir.1996).

### B. Enhancement of Jones's sentence for possession of a firearm

■ Jones challenges the district court's decision to enhance his sentence for possession of a firearm pursuant to the U.S. Sentencing Guidelines, which provides that the base offense level of a defendant convicted of a drug offense should be increased by two levels "[i]f a dangerous weapon (including a firearm) was possessed ." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1). The weapons enhancement "should be applied if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1), cmt. n. 3 (emphasis added).

This court has upheld a district court's decision to apply the enhancement, even "if [the defendant] lacked actual knowledge" of the pistols, where the pistols were found in a "crack den" in which the defendant did not reside, but for which he had cosigned the lease. *See United States v. Dunlap*, 209 F.3d 472, 479 (6th Cir.2000). In addition, this court has upheld the application of the weapons enhancement where a pistol was found inside the drawer of a dresser located in a drug-containing building to which the defendant had access but did not own, *see United States v. Hill*, 79 F.3d 1477, 1485–86 (6th Cir.1996), and where an unloaded Mac–10 semi-automatic firearm was found in the basement rafters, even though the drugs were not nearby and there was no proof that the defendant had handled the firearm, *see United States v. Chalkias*, 971 F.2d 1206, 1217 (6th Cir. 1992).

Similar circumstances exist here. A pistol was found in a jacket hanging on the door of the bedroom where Jones was hiding. The bedroom was located in a residence to which Jones had frequent access. A search of the residence uncovered blocks of marijuana, packing materials, records of addresses to which marijuana boxes were shipped, and tracking numbers for the Western Union wire transfers. Jones, however, points out that he was never observed wearing the jacket, that no proof was presented as to who owned the jacket, that no evidence suggested that the weapon was owned by Jones, and that no evidence established that drugs were found in the bedroom itself. Indeed, one example given by the U.S. Sentencing Guidelines in which it would be deemed clearly improbable that the weapon was connected to the drug offense is "if the

defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S. Sentencing Guidelines Manual § 2D1.1(b)(1), cmt. n. 3.

In light of Jones's arguments, it is certainly possible that the pistol was not connected to Jones or to the drug conspiracy at all. But this court will not set aside the district court's decision to apply the enhancement simply because it is *possible* that the weapon was not connected with the offense. We will instead sustain the district court's holding based on the pistol's presence in the vicinity of Jones and the drugs "unless it is clearly improbable that the weapon was connected with the offense." *Id.* Given this high bar for review, and in light of this court's precedents cited above, the district court's application of the enhancement was not clearly erroneous. We therefore affirm the district court's application of the sentence enhancement.

## C. Determination of relevant conduct attributable to Jones

■ Jones next argues that there was insufficient evidence in the record for the district court to hold him accountable for the marijuana equivalent of $479,700, which was the total amount of money involved in the wire transfers from Ohio to California. He claims that there was no proof linking him to the conspiracy prior to April 27, 1998. *See* U.S. Sentencing Guidelines Manual § 1B1.3, cmt. n. 2 ("A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy"). Accordingly, Jones argues that he should only be held accountable for the 34.86 kilograms of marijuana transferred between April 27, 1998 (when he was observed dropping off the eight boxes at Mail Boxes, Etc.) and May 6, 1998 (when he was arrested at his residence).

The district court, however, had sufficient grounds to link Jones to the conspiracy prior to April 27, 1998. The telephone service at the South Stanley residence had been registered in Jones's name since December of 1997, only a few months after the wire transfers started. The detectives found documents at the residence that linked the residence to both the wire transfers and the drug deliveries. They also found calling cards inside the residence that had been used to call central Ohio on 78 different occasions between September 4, 1997 and May 5, 1998. Given all of this evidence, we conclude that the district court's decision to hold Jones accountable for the full amount of marijuana shipped between October of 1997 and May of 1998 was not clearly erroneous.

## D. Failure to reduce Peairs's sentence by one additional level

As for Peairs, she claims that district court should have granted her three, rather than two, levels of reduction for accepting responsibility for her offenses, as allowed under U.S. Sentencing Guidelines Manual § 3E1.1(b). She bases her argument on the fact that she pled guilty "within a couple of days" of her codefendants.

■ This court, however, accords great deference to the district court's determination of whether a defendant has accepted responsibility for her offenses, and will not overturn the ruling unless it is clearly erroneous. *See United States v. Childers*, 86 F.3d 562, 563 (6th Cir.1996). Furthermore, "[a] defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." U.S. Sentencing Guidelines Manual § 3E1.1, cmt. n. 3.

The district court refused to grant Peairs an additional level of reduction because she waited until just five days before her trial date to plead guilty. *See United*

*States v. Bashara,* 27 F.3d 1174, 1184 (6th Cir.1994), *abrogated on other grounds by statute as stated in United States v. Caseslorente,* 220 F.3d 727 (6th Cir.2000) (holding that a defendant's guilty plea only five days before trial constituted valid grounds for the district court to refuse to grant him an additional level of a reduction under § 3E1.1(b)). By this time, the government had already interviewed witnesses and had begun final preparation for trial. We therefore find no error in the district court's refusal to grant Peairs an additional level of reduction for accepting responsibility for her offense.

E. Determination that Peairs was accountable for the entire amount transferred from Zanesville

█ Peairs also claims that the district court incorrectly enhanced her sentence by two levels because of her alleged involvement in laundering over $200,000 in drug money. *See* U.S. Sentencing Guidelines Manual § 2S1.1(b)(2) (providing that an additional two-level increase is warranted for relevant conduct in excess of $200,000 but less than $350,000). She specifically argues the district court erred by holding her accountable for $229,400—the entire amount transferred by wire from Zanesville—rather than for the amount that she directly transferred, or even for that amount plus the amount transferred by her three coconspirators when she drove them to the Western Union location in Zanesville.

Under Section 1B1.3(a)(1)(B) of the U.S. Sentencing Guidelines, a defendant is not automatically held responsible for all of the acts involved in the charged conspiracy. *See* U.S. Sentencing Guidelines § 1B1.3 cmt. n. 2. Rather, the defendant is held responsible only for the acts that were reasonably foreseeable to him or her in the furtherance of the conspiracy. *See*

*id.* Peairs asserts that although the total amount wired was over $200,000, the record demonstrates that she only had direct or indirect knowledge of $61,500 in such transfers. An amount of less than $200,000 attributable to a defendant does not merit a two-level enhancement under the Guidelines.

To support her argument, Peairs points out that she herself wired only $23,500. In addition, she admitted to only driving Burrell, Goins, and King for the purpose of making wire transfers, and not to driving the other codefendants or having any knowledge of their wire transfers. The total amount of money transferred during the dates on which Peairs drove was $61,-500—far less than the $200,000 baseline for a two-level sentencing enhancement, and even less than the $100,000 baseline for a one-level enhancement.

She also argues that she could not have reasonably foreseen the full extent of the conspiracy, because she did not play a central role in its operation. She was recruited by Goins, and claims that she did not know the source of the money until her fourth wire transfer. Thereafter, she participated in only two more transfers and then discontinued her involvement in the conspiracy. Consequently, Peairs argues that the district court should have held her responsible for no more than $61,500 in wire transfers. We believe that Peairs's points are entitled to further consideration. Although Peairs's lawyer conceded as part of the plea agreement that "the value of the funds laundered was more that $200,000.00," this statement is nevertheless ambiguous as to whether Peairs was aware of the extent of the conspiracy at the time of her involvement, or whether she only realized the extent of the conspiracy upon being informed by the government after her arrest.

Moreover, omissions and miscalculations in the record create serious questions about the level of Peairs's responsibility. *Cf. United States v. Brown,* 147 F.3d 477, 485 (6th Cir.1998) (holding a defendant liable for the total loss caused by a telemarketing company engaged in mail and wire fraud where the defendant was a salesperson at the telemarketing company, was involved in meetings and promotions designed to increase the company's fraudulent sales, and had access to the sales logs of other salespeople). In contrast, the district court made no finding that Peairs was aware that Burrell, Goins, and King were participating in the conspiracy outside of Peairs's presence.

In addition, even if it were foreseeable to Peairs that the women she drove might engage in wire transfers on occasions when she was not present, the district court failed to make a finding as to whether Peairs is responsible for the actions of herself and three codefendants—Burrell, Goins, and King—or for herself and four codefendants—the three just named plus Nechelle Bowen. The inclusion or noninclusion of Bowen makes the difference between a total wire-transfer value of $216,400 (requiring two levels of sentencing enhancement) and $188,900 (requiring only one level of sentencing enhancement). *See* U.S. Sentencing Guidelines Manual § 2S1.1(b)(2).

The government itself is equivocal on this issue. At one point in its brief, the government argues that "[t]he *four* women with whom Peairs traveled to conduct wire transfers were responsible for an additional $152,400.00." (Emphasis added.) In another part of its brief, however, the government states that "Peairs and the *three* women she accompanied to conduct her wire transfers were, between them responsible for 85 of the 91 wire transfers that the Zanesville Group did." (Emphasis added.)

Indeed, there is *no documentation* in the record that Peairs ever drove Bowen. The date-by-date breakdown in the Presentence Investigation Report indicates that Peairs drove only Burrell, Goins, and King. A statement by Peairs is also limited to the admission that "she drove Redenna Burrell, India Goins, and Katina King around to various locations." Although Bowen did make a wire transfer on the same date that Peairs and the women she admitted to driving made their wire transfers (January 23, 1998), Bowen's wire transfer was made from a location at least forty-six minutes away from where the other wire transfers took place. Furthermore, Peairs never admitted to giving Bowen a ride, although she stated that it was possible.

Finally, there appears to be a misstatement in the government's claim, and the district court's finding, that the codefendants driven by Peairs wired $61,000 in addition to the $23,500 that Peairs herself wired. The Presentence Investigation Report calculations show that the $61,000 amount actually *includes* the $23,500 that Peairs herself wired. Although this individual determination does not change the total amount of relevant conduct attributable to Peairs, it does bring into question the accuracy of the arithmetic involved in her sentencing.

In sum, the record does not reflect that the district court sufficiently focused on Peairs's individual involvement to the extent necessary for us to sustain a finding that Peairs was responsible for the amount wired by Bowen, not to mention the full amount wired by the other three codefendants. *See United States v. Tucker,* 90 F.3d 1135, 1144 (6th Cir.1996) (requiring "individualized findings regarding the scope of the conspiracy and the duration and na-

ture of each defendant's participation" before sentencing a defendant for the full quantity of drugs involved in a drug conspiracy scheme). We therefore vacate the district court's decision to enhance Peairs's sentence by two levels for involvement in laundering over $200,000, and remand the case for a rehearing and more detailed factual findings on this issue.

## III. CONCLUSION

For all the reasons set forth above, we AFFIRM the judgment of the district court on all issues other than Peairs's enhancement for laundering over $200,000 in drug money. As to the money-laundering enhancement, we VACATE and REMAND Peairs's sentence for further factual determinations on the scope of her relevant conduct.