Valerie MOORE, Plaintiff,

v.

IT'S ALL GOOD AUTO SALES, INC. and Mark Goodfellow, individually and d/b/a It's All Good Auto Sales, Inc., and Jimmy Foley, individually and as an agent of It's All Good Auto Sales, Inc., Defendants.

No. 11–2758–STA–cgc.

United States District Court,
W.D. Tennessee,
Western Division.

Oct. 1, 2012.

Frank S. Cantrell, Craig P. Barnes, Memphis Area Legal Services, Inc., Memphis, TN, for Plaintiff.

Evan Nahmias, McDonald Kuhn, Memphis, TN, for Defendants.

**ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND OVERRULING DEFENDANTS' OBJECTIONS**

S. THOMAS ANDERSON, District Judge.

Before the Court is the Report and Recommendation of Defendants' (sic) Mark Goodfellow and It's All Good Auto Sales, Inc's Motion to Dismiss (D.E. # 19) entered by United States Magistrate Judge Charmiane G. Claxton on August 30, 2012. Also before the Court is Defendants' (sic) Mark Goodfellow and It's All Good Auto Sales, Inc.'s Objections to the Report and Recommendations Denying Motion to Dismiss (D.E. # 20), timely filed on September 12, 2012. For the reasons stated below, the Report and Recommendation is hereby **ADOPTED** and Defendants' Objections to same are **OVERRULED.**

### *BACKGROUND*

**I. Procedural Background**

Plaintiff Valerie Moore ("Moore" or "Plaintiff") filed a Complaint (D.E. # 1) on September 2, 2011, alleging violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"); the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and Federal Reserve Regulation Z ("Reg Z") (implementing TILA), 12 C.F.R. Part 226; the Tennessee Consumer Protection Act, T.C.A. § 47–18–101, *et seq.* ("TCPA"), the Tennessee Uniform Commercial Code ("UCC"); and common law causes of action for fraud, negligent misrepresentation, and breach of contract. Defendants Mark Goodfellow ("Goodfellow") and It's All Good Auto Sales, Inc. ("IAG") filed a Motion to Dismiss (D.E. # 11) on November 9, 2011, stating that Plaintiff failed to state a claim upon which relief could be granted and that this Court lacked jurisdiction to hear Plaintiff's claims. The Court Referred this Motion to Dismiss to Magistrate Judge Charmiane G. Claxton (D.E. # 17) on June 1, 2012. The Magistrate Judge entered a Report and Recommendation regarding this Motion to Dismiss on August 30, 2012.

**II. Plaintiff's Allegations of Fact**

For the purposes of the instant Report and Recommendation, the Court accepts the following facts as true:[1]

Moore is a 51 year old African American Woman residing in Shelby County, Tennessee. (Compl. ¶ 11). On or about September 4, 2010, Moore visited IAG to shop for a vehicle. (Compl. ¶ 12, 13). Moore visited IAG because it is a "major used-car dealer in Memphis," because of its convenient location, and because of "numerous" advertisements in various media, including television, radio, and internet. (Compl. ¶ 14). These advertisements included a statement by Goodfellow that "I Don't Care About Your Credit. I Care About You." *Id.*

Upon arrival at IAG, Moore saw a number of used luxury and sports cars parked towards the front of the lot, all of which appeared to be in good condition. (Compl. ¶ 15). A "few" of the cars had prices marked, but the rest did not have a price tag or any other notices in their windows. *Id.* A salesman greeted Moore, and inquired how much she had for a down payment. Moore informed him she had "$600 in her pocket for the down payment." (Compl. ¶ 16). The salesman proceeded to show Moore several cars, includ-

---

1. *See Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (When reviewing a motion to dismiss under Rule 12(b)(6), a court will accept all well-pleaded facts in the complaint as true and construe them in the light most favorable to the plaintiff.)

ing a 1994 Toyota Camry. (Compl. ¶ 17). The salesman did not permit Moore to test drive the Camry on the road, but only in the lot. *Id.* The salesman told Moore that she would need a down payment of $800 to purchase the Camry, at which point Moore reiterated she only had $600. *Id.*

During the discussion of the down payment for the Camry, Defendant Jimmy Foley ("Foley") introduced himself to Moore. (Compl. ¶ 18). Foley informed Moore that the down payment for the Camry would be $1000. *Id.* Moore once again stated she only had $600. Foley told her "We can work something out with you, we can work something out." *Id.*

Moore completed a form with some personal information and Foley produced a contract for sale for the Camry. (Compl. ¶ 19). Foley drew Moore's attention away from certain numbers, such as the cash down payment, the deferred down payment, annual percentage rate ("APR") and other disclosures mandated by TILA and towards a series of other numbers—the "quickpay." (Compl. ¶ 20). Foley described three "quickpays," without defining the term "quickpay." *Id.* Moore understood the "quickpays" to be her down payment of $1000 for the Camry. (Compl. ¶ 22). After signing the contract and visiting her newborn great-granddaughter in the hospital, Moore took a closer look at the contract's terms. (Compl. ¶ 24). From the face of the contract, it appeared that the total down payment was $1520, not the $1000 discussed with Foley. *Id.*

Moore returned to IAG the next morning as soon as the dealership opened. (Compl. ¶ 25). Moore asked Foley why the down payment was $1520 instead of $1000. *Id.* Foley stated the $520 was sales tax. *Id.* Moore inquired why IAG had charged her twice for sales tax, indicating that line 7 of the sales contract showed a charge of $518.20 for sales tax. *Id.* Foley then discussed "quickpay" without defining

the term, failing to answer Moore's questions. *Id.*

Moore returned to IAG on September 6th to speak to Goodfellow. (Compl. ¶ 27). Moore told Goodfellow about the discrepancy in her down payment, and also informed him that the car had begun to make a "knocking" sound. *Id.* Moore asked for a refund, a request Goodfellow refused. *Id.* Goodfellow told Moore that if she did not want the vehicle any longer, she could leave it on the lot. *Id.* The Court infers that this was so Goodfellow could resell the vehicle and apply the sales price to the balance of the sales contract. Although Moore "believed she had been cheated," she chose to keep the vehicle because she did not want to lose the $650 down payment she had already made. (Compl. ¶ 28). Moore made timely payments on the "quickpays" in the amount of $870 and three regular payments of $250. *Id.* All told, Moore paid $2270 to IAG towards the purchase of the Camry. *Id.*

After the September 6th visit to IAG, Moore continued to have problems with the car. *Id.* IAG agreed to repair the vehicle in exchange for adding the cost of repairs to the amount of the sales contract. *Id.* Despite these repairs, the Camry continued to have problems and sometime in November 2010, the car suffered a complete breakdown. (Compl. ¶ 29). Three mechanics were unable to get the Camry to start. (Compl. ¶ 30). Moore contacted Goodfellow to tell him the vehicle was inoperable. (Compl. ¶ 31). Goodfellow told her to "fix the car." *Id.* Moore informed him she could not afford to do so. *Id.* Goodfellow then asked her to bring the car to IAG, which Moore stated she could not do as it was inoperable. *Id.* Goodfellow suggested that Moore have the vehicle towed, which Moore said she could not afford. *Id.* Finally, Goodfellow offered to send his own tow truck, which Moore ac-

cepted. *Id.* The tow truck picked up the Camry later that day. *Id.*

Moore then called Goodfellow to find out when her car would be ready. (Compl. ¶ 32). Goodfellow replied that he did not know, because he had hundreds of other cars to get ready for "tax time." *Id.* Moore determined from this conversation that Goodfellow and IAG had no intention of making repairs anytime soon. (Compl. ¶ 33). Believing she had been "lied to during and after the sale of the car," Moore contacted an attorney, who drafted a rescission letter. (Compl. ¶¶ 33–34). When Moore visited IAG to deliver the rescission letter and collect her belongings from the Camry, she found the Camry in a "remote lot-nowhere near the dealership's repair shop." (Compl. ¶ 35). From this, she deduced that IAG had no intention of repairing the vehicle. *Id.* In February, Moore received notice that IAG would sell the Camry in a public sale. (Compl. ¶ 36).

## STANDARD OF REVIEW

The Court has authority pursuant to 28 U.S.C. § 636(b)(1)(C) to review *de novo* any portions of a Magistrate Judge's report to which objections are made.[2] Furthermore, the Court must review all issues raised by Plaintiff's objections.[3]

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)") challenges a complaint for failure to state a claim upon which relief may be granted. This motion only tests whether the plaintiff has pleaded a cognizable claim.[4] A motion under Rule 12(b)(6) allows a court to dismiss meritless claims which would otherwise waste judicial resources on the basis of a dispositive issue of law.[5] In determining whether it should grant a motion to dismiss under Rule 12(b)(6), the court must examine the complaint to determine whether the complaint contains a short and plain statement of the claim showing the plaintiff is entitled to relief.[6] The court must also examine the complaint to determine whether the defendant has provided fair notice of what the plaintiff's claim is and the grounds upon which it rests.[7] While a complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not suffice.[8] The complaint must give a factual foundation, and the mere possibility that a plaintiff might later establish some set of undisclosed facts to support recovery is insufficient to survive a 12(b)(6) challenge.[9] The facts, as pleaded, must be enough to raise a right to relief above the speculative level.[10] The complaint must contain sufficient factual matters to state a claim that is plausible on its face.[11]

**2.** *United States v. Worley,* 193 F.3d 380, 383 (6th Cir.1999).

**3.** *United States v. Shami,* 754 F.2d 670, 672 (6th Cir.1985) (citing *United States v. Raddatz,* 447 U.S. 667, 675–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)).

**4.** *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988).

**5.** *See, e.g., Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).

**6.** Fed.R.Civ.P. 8(a)(2).

**7.** *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976).

**8.** *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

**9.** *Id.* at 561, 127 S.Ct. 1955.

**10.** *Id.* at 555, 127 S.Ct. 1955.

**11.** *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

When reviewing a complaint pursuant to a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff.[12] The court need not accept legal conclusions or unwarranted factual inferences.[13] When a complaint does adequately state a plausible claim for relief, the court may not dismiss it based on an assessment that the party will "fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." [14]

■ Federal Rule of Civil Procedure 9(b) ("Rule 9(b)") states a heightened pleading standard when a complaint alleges fraud. "[A] party must state with particularity the circumstances constituting fraud or mistake." [15] Courts in the Sixth Circuit read this rule liberally, requiring a plaintiff to, at a minimum, "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." [16]

## ANALYSIS

Defendants raise two major objections to the Magistrate Judge's Report and Recommendation. The first objection is that the Magistrate Judge improperly recommended the Court deny Defendant's Motion to Dismiss as to the RICO charges.[17] The second objection is that the Magistrate Judge failed to dismiss the negligent misrepresentation claim as against Goodfellow.[18] The Court will address these objections in turn.

## I. The Magistrate Judge correctly recommended denial of Defendants' Motion to Dismiss as to the RICO Act.

■ RICO prohibits a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce" from conducting "such enterprise's affairs through a pattern of racketeering activity[.]" [19] The purpose of RICO is to combat "organized and/or continuing patterns of criminal activity," [20] and the statute should be liberally read to effectuate this purpose.[21] To establish a RICO violation, a plaintiff must show: 1) two or more predicate offenses; 2) the existence of an enterprise; 3) a pattern of racketeering activity that bears a sufficient nexus to the enterprise; and 4) an injury to the plaintiff's business or property as a result of the first three elements.[22]

12. *Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827; *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983).

13. *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 405–06 (6th Cir.1998).

14. *Twombly,* 550 U.S. at 564, fn. 8, 127 S.Ct. 1955.

15. Fed.R.Civ.P. 9(b).

16. *Advocacy Org. for Patients and Providers v. Auto Club Ass'n,* 176 F.3d 315, 322 (6th Cir. 1999) (quoting *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993)).

17. Defs.' Obj. Rep. & Rec. at 1–2.

18. *Id.* at 2.

19. 18 U.S.C. § 1962(c) (1988).

20. *United States v. Qaoud,* 777 F.2d 1105, 1115 (6th Cir.1985).

21. *Id.*

22. *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 699 (6th Cir.2000).

**A. The Magistrate Judge correctly recommended denial of Defendants' Motion to Dismiss with respect to the heightened pleading standards of Rule 9(b) and the allegation of wire fraud as a predicate offense.**

█ Wire fraud is a predicate act for purposes of RICO liability.[23] Wire fraud is defined as the transmission by means of wire, radio, or television communication in interstate commerce any writings, signs, signals, pictures or sounds for the purpose of executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.[24] In other words, an allegation of wire fraud require a showing of "(1) a scheme to defraud, and (2) use . . . of an interstate electronic communication . . . in furtherance of the scheme."[25] In establishing a scheme to defraud by wire, wire communication must "be employed 'for the purpose of executing such scheme or artifice.'"[26]

█ With respect to predicate offenses of fraud, these claims must be pleaded with particularity.[27] The Sixth Circuit holds that "the plaintiffs, at a minimum, must allege the time, place, and content of the alleged misrepresentation on which they relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud."[28] Further,

> [w]hen pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.[29]

█ The Court finds that, under this standard, Moore properly pleaded the elements of the predicate RICO offense of wire fraud. Moore alleged several instances of fraudulent statements by Defendants: the salesman's statement that the down payment for the Camry would be $800,[30] Foley's statement that the down payment for the Camry would be $1000,[31] Moore's statements that the "quickpay" total included sales tax,[32] and Goodfellow's statements that he would repair the Camry.[33] Further, Plaintiff clearly identifies the speaker in each instance, where and when the statements were made, and explains why the statements were fraudulent.

Defendants contend that the various advertisements featuring Goodfellow and his trademarked phrase "I Don't Care About Your Credit, I Care About You" cannot be

---

**23.** 18 U.S.C. § 1961(1) (2006).

**24.** 18 U.S.C. § 1343 (2008).

**25.** *Advocacy Org. for Patients and Providers,* 176 F.3d at 322 (citing *United States v. Brown* 147 F.3d 477, 483 (6th Cir.), *cert. denied,* 525 U.S. 918, 119 S.Ct. 270, 142 L.Ed.2d 223 (1998).

**26.** *United States v. Daniel,* 329 F.3d 480, 489 (6th Cir.2003) (quoting 18 U.S.C. § 1343).

**27.** Rule 9(b).

**28.** *Heinrich v. Waiting Angels Adoption Services, Inc.,* 668 F.3d 393, 403 (6th Cir.2012) (citing *United States ex rel. Bledsoe v. Cmty.* *Health Sys., Inc.,* 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993))) (internal quotations omitted).

**29.** *Heinrich,* 668 F.3d at 404–05 (citing *Frank v. Dana Corp.,* 547 F.3d 564, 570 (6th Cir. 2008) (quoting *Gupta v. Terra Nitrogen Corp.,* 10 F.Supp.2d 879, 883 (N.D.Ohio 1998))).

**30.** Compl. ¶ 17.

**31.** Compl. ¶ 18.

**32.** Compl. ¶ 25.

**33.** Compl. ¶¶ 32, 33.

considered fraudulent so as to constitute an element of wire fraud as a predicate offense under RICO.[34] Defendants contend that these advertisements were mere puffery, and that a reasonable person could not rely on them.[35] However, the Court does not read 18 U.S.C. § 1343 to require that the use of interstate electronic communication itself be fraudulent in order to make out a claim for wire fraud; rather, as the plain language of the statute suggests, there must simply be use of interstate electronic communication in *furtherance* of a fraudulent scheme.

Defendants correctly note that "[m]ere use of the wires does not make an alleged fraud subject to RICO jurisdiction."[36] However, as the *Vild* panel went on to discuss, the use of interstate electronic communication in that case was "mere happenstance"[37] and "unrelated to the other alleged conduct committed against ultimate consumers."[38] In the instant case, Moore alleges that IAG's use of interstate electronic communication is vital to their fraudulent scheme, and describes how the nature and timing of the advertising is designed to entice poor African Americans into the dealership.[39] The Court finds that these allegations make the use of interstate electronic communications into more than the mere happenstance contemplated by the *Vild* panel.

As such, Defendants' Objections to the Magistrate Judge's Report and Recommendation as to denial of Defendants' Motion to Dismiss under the heightened pleading standards of Rule 9(b) are **OVERRULED.**

## B. The Magistrate Judge correctly recommended the Court find a RICO Enterprise.

Defendants' next contention is that the Magistrate Judge failed to address the longevity requirement for a RICO enterprise.

 For the purpose of RICO liability, an enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct."[40] An " 'enterprise includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.' "[41] To establish an association-in-fact enterprise, a plaintiff must show "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged."[42]

 To establish that an association-in-fact operated as a "continuing unit," the plaintiff must allege "facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit.' "[43] "All that is required is some minimal level of organizational structure between the entities involved."[44] An association-in-fact enter-

34. Defs.' Obj. At 4.

35. *Id.*

36. *Id.,* quoting *Vild v. Visconsi,* 956 F.2d 560, 567 (6th Cir.1992).

37. *Vild,* 956 F.2d at 568.

38. *Id.*

39. Compl. ¶¶ 42, 45.

40. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

41. 18 U.S.C. § 1961(4) (2006).

42. *VanDenBroeck,* 210 F.3d at 699.

43. *Begala v. PNC Bank, Ohio, Nat. Ass'n,* 214 F.3d 776, 782 (6th Cir.2000) (citing *Frank v. D'Ambrosi,* 4 F.3d 1378, 1386 (6th Cir.1993)).

44. *VanDenBroeck,* 210 F.3d at 699.

prise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." [45] Proving "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" [46]

■ Although Moore's pleadings indicate that IAG is an association-in-fact,[47] the Court finds that the allegations in the Complaint sufficiently set forth that IAG is a legal entity organized under the laws of the State of Tennessee.[48] The Complaint further avers that Goodfellow is the founder and principal shareholder of IAG, and actively controls the day to day operation of the business.[49] The Complaint goes on to state that Foley is the general manager and a shareholder of IAG, and is actively involved in the day to day operations of the business.[50] As IAG meets the definition of an enterprise under the plain language of 18 U.S.C. § 1961(4), the Court finds it unnecessary to analyze whether IAG is an association-in-fact.

Defendants' Objection to the Magistrate Judge's determination that IAG was a RICO enterprise is bottomed on an assertion the Magistrate Judge failed to consider the longevity requirement of an association-in-fact. Since the Court finds that IAG is an association *de jure* instead of an association-in-fact, this Objection is **OVERRULED** as moot.[51]

## C. The Magistrate Judge correctly recommended the Court find a pattern of racketeering activity.

■ To establish a pattern of racketeering activity, a plaintiff must show a minimum of two acts of racketeering activity within ten years of each other.[52] The plaintiff must show both a relationship between the predicate acts and a threat of continuing activity.[53] These two requirements, continuity and relationship, are analytically distinct prongs of the pattern requirement under RICO.[54]

■ Continuity may be either closed-ended or open-ended.[55] Closed-ended continuity refers to a "closed period of repeated conduct extending over a substantial period of time."[56] Open Open-ended continuity refers to past conduct "which by its nature projects into the future with a threat of repetition."[57] A plaintiff may establish a threat of repetition "by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."[58] A plaintiff may establish relatedness by showing the predicate acts have "the same or similar purposes, results, participants, victims,

---

**45.** *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

**46.** *Id.* at 947, 129 S.Ct. 2237 (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524).

**47.** Compl. ¶¶ 43, 44.

**48.** Compl. ¶ 7.

**49.** Compl. ¶ 8.

**50.** Compl. ¶ 9.

**51.** Defs' Obj. At 5.

**52.** *Vild*, 956 F.2d at 565.

**53.** *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

**54.** *Vild*, 956 F.2d at 566.

**55.** *Vemco, Inc. v. Camardella*, 23 F.3d 129, 133–134 (6th Cir.1994).

**56.** *Id.*

**57.** *Id.*

**58.** *H.J. Inc.*, 492 U.S. at 241–42, 109 S.Ct. 2893.

or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events."[59]

■ The Court finds that Plaintiff sufficiently alleges at least two acts of racketeering activity occurring within ten years of each other. Plaintiff alleges that Defendants' use of interstate electronic communications to further a fraudulent scheme constitutes wire fraud as a predicate act to RICO liability.[60] Drawing all reasonable inferences in Plaintiff's favor, the Court finds that the pervasive advertising by Defendant that Plaintiff alleges[61] would not be targeted towards just one victim. Further, Plaintiff alleges multiple fraudulent activities facilitated by the use of interstate electronic communication, including a "bait and switch"-type fraud in the negotiation of down payments[62] and fraud as to the nature and reliability of vehicles sold.[63] Again, drawing all reasonable inferences in Plaintiff's favor and taking Plaintiff's factual allegations as true, the Court finds that Defendant would have practiced the alleged scheme more than once in ten years.

■ Likewise, the Court finds that Plaintiff sufficiently alleges an open-ended threat of continuing activity. Plaintiffs allege that the RICO predicate act of wire fraud is Defendants' regular way of doing business.[64] While the pleading standards of Fed.R.Civ.P. 8 require more than labels, conclusions, or formulaic recitations of the elements of a cause of action,[65] this standard does not force the plaintiff's well-pleaded facts to be persuasive as well as plausible.[66] While Plaintiff may not have made her case on the pleadings alone, the Court finds it at least plausible, taking Plaintiff's allegations of fact as true, that Defendants' regular way of doing business includes the described fraudulent activity.

Defendants argue that Plaintiff's factual allegations relate only to one scheme, the alleged scheme to defraud Moore.[67] Defendants further argue that the alleged scheme to defraud Moore only took place over a six-month time period.[68] Defendants rely on the Sixth Circuit's opinion in *Vemco, Inc. v. Camardella*[69] to assert that allegations of single instance of fraud, while not dispositive to the issue of continuity, is relevant to the inquiry.[70] The *Vemco* panel went on to discuss that a single instance of fraud against a single plaintiff over the course of seventeen months did not satisfy the continuity requirement under RICO.[71] However, as Plaintiff points out, the plaintiff in *Vemco* did not allege that the alleged predicate acts were part of the defendant's regular way of doing business.[72] Further, the

**59.** *Id.* at 133 (quoting *Vild*, 956 F.2d at 566).

**60.** Compl. ¶ 40.

**61.** Compl. ¶¶ 14, 45.

**62.** Compl. ¶¶ 47–49.

**63.** Compl. ¶ 51.

**64.** Compl. ¶¶ 46–51.

**65.** *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**66.** *Mediacom Se. LLC v. BellSouth Telecomms., Inc.*, 672 F.3d 396, 400 (6th Cir. 2012).

**67.** Defs.' Obj. at 6.

**68.** *Id.*

**69.** 23 F.3d 129 (6th Cir.1994).

**70.** Defs'. Obj. at 6, citing *Vemco*, 23 F.3d at 134.

**71.** *Id.*

**72.** Pls.' Resp. at 8, citing *Vemco*, 23 F.3d at 135.

Court notes that Plaintiff alleges "year round" use of interstate electronic communication, and that Defendants intensify their advertising at the beginning of the year.[73] Taking Plaintiff's allegations as true and drawing reasonable inferences in Plaintiff's favor, the Court finds that these allegations give rise to an inference of annual intensification of advertising in furtherance of the alleged fraudulent scheme, necessarily implying that the alleged fraudulent scheme lasted more than six months. Further, the Court finds it implausible that such repeated advertising would target a single person of modest means; rather, it is plausible to assume that if such advertising were in furtherance of an alleged fraudulent scheme, the scheme was meant to defraud multiple parties.

As Plaintiff properly pleaded sufficient facts to establish the pattern requirement for RICO liability, Defendants' Objections to the Magistrate Judge's Recommendations on this point are **OVERRULED.**

**D. Defendants do not object to the Magistrate Judge's recommendations regarding proximate cause.**

As Defendants make no objection to the Magistrate Judge's Recommendation regarding the proximate cause requirement for RICO liability, the Court hereby **ACCEPTS** the Magistrate Judge's Recommendation as to this requirement.

*II. The Magistrate Judge correctly recommended the Court deny Defendants' Motion to Dismiss with respect to Moore's claim for negligent misrepresentation as against Goodfellow.*

■ "A federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction."[74] A District Court sitting in diversity must apply the law of the state in which it sits.[75] Thus, the Court will apply Tennessee substantive law to Plaintiff's negligent misrepresentation claims.

The Tennessee Supreme Court adopts the formulation of the Restatement (Second) of Torts § 552 for negligent misrepresentation claims.[76] Section 552 states that the tort of negligent misrepresentation requires:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

73. Compl. ¶ 45.

74. *Super Sulky, Inc. v. U.S. Trotting Ass'n,* 174 F.3d 733, 741 (6th Cir.1999).

75. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

76. *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 130 (Tenn.1995).

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.[77]

Explaining this standard as applied to parties not in contractual privity, the Tennessee Supreme Court articulated four elements to negligent misrepresentation:

(1) the defendant is acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; *and*

(2) the defendant supplies faulty information meant to guide others in their business transaction; *and*

(3) the defendant fails to exercise reasonable care in obtaining or communicating the information; *and*

(4) the plaintiff justifiably relies upon the information.[78]

**A. Defendants make no objection to the Magistrate Judge's Recommendations with respect to whether Moore sufficiently alleged that Goodfellow was acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary interest; whether Goodfellow failed to exercise reasonable care in obtaining or communicating information; or whether Moore justifiably relied upon the information.**

Seeing no objections to the Magistrate Judge's Recommendations with respect to whether Plaintiff properly pleaded these issues, the Magistrate Judge's Recommendations as to these issues are hereby **ADOPTED.**

**B. The Magistrate Judge properly recommended that Moore pleaded sufficient facts to allege Goodfellow supplied faulty information to Moore.**

Defendants' sole objection on the question of whether Plaintiff properly pleaded sufficient facts as to the claim of negligent misrepresentation is bottomed on the assertion that Plaintiff failed to allege Goodfellow ever supplied faulty information to Moore.[79] Defendants further state the "only factual allegations regarding [Moore]'s dealings with [Goodfellow] are found in paragraphs 27 and 31–33 of the Complaint."[80] Defendant asserts that since the Magistrate Judge found that Goodfellow was not involved in negotiation of the sales contract with Moore, the negligent misrepresentation claim should be dismissed.[81]

■ It is true that the Plaintiff does not allege Goodfellow was involved in the direct negotiation of the sales contract with Moore.[82] As such, the Magistrate Judge properly recommended that the TILA claims against Goodfellow be dismissed.[83] However, Plaintiff alleges more dealings with Goodfellow than simply the negotiation of a sales contract.

---

**77.** Restatement (Second) of Torts § 552 (1977)

**78.** *Id.* (quoting *John Martin Co. Inc. v. Morse/Diesel, Inc.*, 819 S.W.2d 428, 431 (Tenn.1991)).

**79.** Defs.' Obj. at 8.

**80.** *Id.*

**81.** *Id.*

**82.** M.J.'s Rep't. & Rec. at 15.

**83.** *Id.*

First, Plaintiff alleges that the depiction of Goodfellow in advertising along with his trademarked phrase "I don't care about your credit, I care about you" was the type of faulty information which could give rise to a claim for negligent misrepresentation.[84] Tennessee courts define "puffing" as "loose general statements made by sellers in commending their products. These statements embody exaggerations, the truth or falsity of which cannot be determined easily, that amount to no more than the seller's opinion[.]"[85] Under Tennessee law, courts are

> generally ... cautious about a seller's claim that its representations were mere puffing. Thus, the question of whether a particular statement amounts to an actionable misrepresentation will generally be left to the jury whenever circumstances indicate that the buyer reasonably understood that he or she was receiving something in the way of an assurance as to specific facts.[86]

The Court is unwilling, at this stage of the litigation, to declare Goodfellow's trademarked phrase mere puffery on which Moore could not have relied as a matter of law. While it may be exceedingly difficult for Plaintiff to prove whether Goodfellow cared about her or not, or whether his actions indicated such, at this stage in the pleadings the Court may not weigh the evidence.[87] Rather, the Court's inquiry is to determine whether there is any set of facts in support of Plaintiff's claim that would entitle her to relief.[88]

■ Second, Plaintiff specifically asserts that all defendants, Goodfellow included, failed to display required FTC disclosures on vehicles owned for sale by IAG.[89] Goodfellow was under a duty imposed by law to furnish required FTC disclosures.[90] As noted above, under Tennessee law, a legal duty to provide information can lead to liability under a theory of negligent misrepresentation to all persons in the protected class.[91] Seeing that Goodfellow had a legal duty to provide the disclosures mandated by federal regulation, the Court finds that Moore sufficiently pleads facts giving rise to a plausible inference that Goodfellow's alleged failure constituted faulty information.

■ Finally, Plaintiff alleges a conversation between herself and Goodfellow in which she tells him that her car is inoperable and he directs her to bring the vehicle to the dealership.[92] The Court finds that this conversation could be found by a jury to reasonably be understood by Moore to mean that Goodfellow was to fix the automobile, particularly in light of the alleged past dealings between the parties (i.e. the multiple previous repairs Plaintiff alleges.)[93] Moore further alleges that she discovered the vehicle in a lot far away from the repair shop, approximately two months after she had left it in Goodfellow's care.[94]

84. Compl. ¶¶ 14, 37

85. *Ladd by Ladd v. Honda Motor Co., Ltd.,* 939 S.W.2d 83, 100 (Tenn.Ct.App.1996).

86. *Id.*

87. *Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995) (citing *Cameron v. Seitz,* 38 F.3d 264, 270 (6th Cir.1994)).

88. *Miller,* 50 F.3d at 377 (citing *Cameron,* 38 F.3d at 270 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))).

89. *Id.* ¶ 32.

90. *See* 16 C.F.R. § 455.2.

91. *Ritter,* 912 S.W.2d at 130.

92. Compl. ¶ .

93. Compl. ¶¶ 28–29

94. Compl. ¶ 35.

The Court finds that these facts together, taken as true, lead to a reasonable inference in favor of Plaintiff that Goodfellow misrepresented whether he would fix Moore's vehicle.

Since Plaintiff pleads sufficient facts to show Goodfellow might be held liable on a theory of negligent misrepresentation, Defendants' Objections are hereby **OVERRULED.**

### CONCLUSION

As discussed above, the Court finds that the Magistrate Judge properly recommended that Plaintiff's claims for violations of RICO not be dismissed. Further, the Court finds that the Magistrate Judge properly recommended that Plaintiff's claim against Goodfellow for negligent misrepresentation not be dismissed. The Court notes no other objections before it, and any further exceptions to the Magistrate's Report and Recommendation would be untimely.[95] As such, the Magistrate Judge's Report and Recommendation is hereby **ADOPTED** and Defendants' Objections hare hereby **OVERRULED.**

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION OF DEFENDANTS' MARK GOODFELLOW AND IT'S ALL GOOD AUTO SALES, INC.'S MOTION TO DISMISS

CHARMIANE G. CLAXTON, United States Magistrate Judge.

Before the Court is Defendants Mark Goodfellow ("Goodfellow") and It's All Good Auto Sales, Inc.'s ("IAG") (collectively "Defendants") Motion to Dismiss. (Docket Entry "D.E." # 11). The instant motion was referred to United States Magistrate Judge Charmiane G. Claxton for Report and Recommendation. (D.E. # 17). For the reasons set forth herein, the court RECOMMENDS that Goodfellow and IAG's Motion to Dismiss be GRANTED in part and DENIED in part.

### I. Procedural Background

On September 2, 2011, Plaintiff Valerie Moore ("Moore") filed a Complaint for damages, alleging violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"), the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.* ("TILA") and Regulation Z (which implements TILA), 12 C.F.R. Part 226, *et seq.*, fraud, the Tennessee Consumer Protection Act, T.C.A. § 47–18–101, *et seq.* ("TCPA"), negligent misrepresentation, the Tennessee Uniform Commercial Code, and breach of contract. (Plaintiff's Complaint, "Pl.'s Compl.," ¶¶ 37–87). On November 9, 2011, Defendants IAG and Goodfellow filed the instant Motion to Dismiss for lack of subject-matter jurisdiction and/or failure to state a claim upon which relief may be granted. (D.E. # 11).

### II. Proposed Findings of Fact

On or about September 4, 2010, Moore, an African–American female who resides in Shelby Country, Tennessee, went to IAG in search of a reliable and affordable vehicle to purchase. (Pl.'s Compl. ¶¶ 6, 12, 13). Moore was attracted to IAG because it is a "major used-car dealership in Memphis" with a convenient location. (Pl.'s Compl. ¶ 14). Moore was also attracted by the numerous television, radio, and internet advertisements featuring Goodfellow, IAG's founder and principal shareholder, promising, "I Don't Care About Your Credit. I Care About You." (Pl.'s Compl. ¶¶ 8, 12–13). Upon arriving at IAG,

---

**95.** *See* Fed.R.Civ.P. 72(b)(2) (party objecting to Magistrate Judge's Report and Recommendations must object within fourteen days).

Moore observed a number of used luxury and sports cars parked at the front of the lot with prices marked on them that appeared to be in good condition. (Pl.'s Compl. ¶ 15). Moore also noticed that the rest of the vehicles on IAG's lot did not appear to have visible price tags or other notices on their windows. *Id.*

A salesman greeted Moore at the entrance of IAG's lot, inquiring as to the amount of a down payment Moore could afford to purchase a vehicle, and she informed him she had "$600 in her pocket for the down payment." (Pl.'s Compl. ¶ 16). The salesman proceeded to show Moore several cars. (Pl.'s Compl. ¶ 17). Moore selected a 1994 Toyota Camry that she was permitted to test drive around the IAG lot but not on a road. *Id.* After the test drive, Moore was informed that the Camry she selected required a down payment of $800, and Moore reiterated that she only had $600. *Id.* During these discussion regarding the down payment, Moore was greeted by Jimmy Foley ("Foley"), General Manager and shareholder at IAG, who told Moore that the Camry required a $1000 down payment. (Pl.'s Compl. ¶¶ 9, 18). Moore informed Foley that she could not afford a $1000 down payment, but she was told by Foley that "we can work something out," and she went with him into his office. (Pl.'s Compl. ¶ 18).

After Moore completed a form with her basic personal information, Foley presented Moore with a contract for the sale of the Camry. (Pl.'s Compl. ¶ 20). Foley drew Moore's attention to a series of numbers (the "quickpay"), overlooking the cash down payment, deferred down payment, the annual percentage rate ("APR"), and truth-in-lending boxes at the top of the contract. *Id.* Without defining the "quickpay" system, Foley informed her that her first "quickpay" of $350 would be due September 7, 2010, that the next "quickpay"

would be due on September 21, 2010, and the final "quickpay" would be due in October, 2010. *Id.* It was Moore's understanding that the three "quickpay" payments were the $1000 down payment she agreed to pay. (Pl.'s Compl. ¶ 22).

At this time, the dealership was beginning to close, and she needed to leave as her great-grandchild had been born while she was attempting to purchase her vehicle. (Pl.'s Compl. ¶¶ 21, 23). Moore said that she was "exhausted" from car shopping and needed the vehicle for doctor's appointments, taking her grandson to school, and transporting herself around Memphis. (Pl.'s Compl. ¶ 21). Moore signed the sales contract at the bottom of the document in reliance upon Foley's statements that the down payment was $1000. *Id.* Moore was given a copy of the sales contract after she signed it, and she left IAG's lot with her new vehicle approximately thirty minutes later. (Pl.'s Compl. ¶ 23). An additional copy of the sales contract was retained by IAG. *Id.* Later that evening, after Moore returned home from visiting her great-grandchild, she took "another look" at the sale contract and realized, upon "closer inspection," that the total of the "quickpay" payments was $1520, not $1000. (Pl.'s Compl. ¶ 24).

The next morning, September 5, 2010, Moore returned to IAG as soon as the dealership opened for business to inquire about the higher price. (Pl.'s Compl. ¶ 25). Foley told Moore that the higher price represented $520 in sales tax. *Id.* Moore pointed to the seventh line of the sales contract, which listed "Sales Tax" in the amount of $518.20, and inquired as to why she was being charged twice. *Id.* Instead of answering her question, Foley began to talk about the "quickpay" process, again without explaining this term. *Id.* Moore became frustrated and felt that he had been dishonest during the purchase of the

vehicle and was continuing to be dishonest to "cover it up." (Pl.'s Compl. ¶ 26).

Moore returned to IAG the following day, September 6, 2010. (Pl.'s Compl. ¶ 27). On this date, Moore spoke with Goodfellow about the price discrepancy as well as about a constant "knocking" noise the car had begun making. (Pl.'s Compl. ¶ 27). Moore asked Goodfellow for a refund due to the misrepresentation and "poor condition" of the vehicle; she was told that she could not have a refund but she could leave the car on IAG's lot if she did not want it anymore. *Id.* Moore still "believed that she had been cheated" but chose to keep the vehicle because she did not want to lose the $650 she paid as a down payment. (Pl.'s Compl. ¶ 28). Moore made the "quickpay" payments in the amount of $870 and made three regular payments of $250 per month. *Id.* In total, Moore paid $2270 of the total price of $8830. (Pl.'s Compl. ¶ 28).

The vehicle continued to have electrical and mechanical problems, and the vehicle broke down completely in November, 2010. (Pl.'s Compl. ¶¶ 29–30). Moore took her vehicle to a repair shop, but three mechanics were unable to get the car to start. (Pl.'s Compl. ¶ 30). Moore called IAG and spoke with Goodfellow, informing him that her vehicle had become inoperable. (Pl.'s Compl. ¶ 31). Goodfellow initially "told her to fix the car," but Moore stated that she could not afford to do so. *Id.* Goodfellow then suggested that she bring the car to his dealership. *Id.* Moore stated that she could not do so because it was not running, and he asked her to tow it to his dealership. *Id.* She again reiterated that she could not afford to do so. *Id.* Ultimately, Goodfellow arranged for Moore's vehicle to be towed to IAG. *Id.*

After the vehicle was towed, Moore called Goodfellow and asked when her car would be ready. (Pl.'s Compl. ¶ 32). Goodfellow told Moore that he did not know

and that he had "hundreds" of other vehicles to be worked on as well for "tax time." *Id.* Based on this conversation, Moore believed Goodfellow had no intention of repairing her vehicle anytime soon. (Pl.'s Compl. ¶ 33). Moore continued to believe that she had been "lied to during and after the sale of the car" and contacted an attorney, who prepared a revocation/rescission letter for her. (Pl.'s Compl. ¶ 34). In January, 2011, Moore returned to IAG to deliver the letter, drop off the keys to the vehicle, and retrieve her personal belongings from it. (Pl.'s Compl. ¶ 35). She found that her vehicle was located on a remote lot nowhere near IAG's repair shop, which further confirmed her concern that Goodfellow did not have "any intention of repairing the vehicle." (Pl.'s Compl. ¶ 35). In February, 2011, Moore received notice from IAG that her vehicle would be sold at a public sale. (Pl.'s Compl. ¶ 36).

### III. Legal Standard

A Rule 12(b)(1) motion attacks a complaint for lack of jurisdiction over the subject matter. Such a motion requires that the court accept the non-moving party's allegations of facts as true. *DLX, Inc. v. Kentucky,* 381 F.3d 511, 516 (6th Cir.2004). Where subject matter is challenged, the party asserting jurisdiction bears the burden of establishing jurisdiction. *Moir v. Greater Cleveland Regional Transit Auth.,* 895 F.2d 266, 269 (6th Cir.1990). Further, "the plaintiff, as the party invoking federal subject matter jurisdiction, has the burden of persuading the court that all of the requirements necessary to establish standing to bring the lawsuit have been met." *Courtney v. Smith,* 297 F.3d 455, 459 (6th Cir.2002).

A Rule 12(b)(6) motion challenges a complaint for failure to state a claim upon which relief may be granted. This motion

only tests whether the plaintiff has pleaded a cognizable claim. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Essentially, it allows the court to dismiss, on the basis of a dispositive issue of law, meritless cases which would otherwise waste judicial resources and result in unnecessary discovery. *See, e.g., Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). To determine whether a motion to dismiss should be granted, the court must examine the complaint. The complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief, Fed. R.Civ.P. 8(a)(2), and it must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). While a complaint need not present detailed factual allegations, to be cognizable it must provide more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1959, 167 L.Ed.2d 929 (2007); *see also Scheid,* 859 F.2d at 436–37. A complaint must have a factual foundation, and the mere possibility that a plaintiff might later establish some set of undisclosed facts to support recovery is insufficient to survive a 12(b)(6) challenge. *Twombly,* 127 S.Ct. at 1968. In reviewing the complaint, the court must accept as true all factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Neitzke,* 490 U.S. at 326–27, 109 S.Ct. 1827; *Windsor v. The Tennessean,* 719 F.2d 155, 158 (6th Cir.1983). However, only well-pleaded facts must be taken as true, and the court need not accept legal conclusions or unwarranted factual inferences. *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 405–06 (6th Cir.1998). When a complaint does adequately state a claim, it may not be dismissed based on the court's assessment that the party will "fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly,* 127 S.Ct. at 1969.

Rule 9(b) requires that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R.Civ.P. 9(b). The Sixth Circuit has read the Rule 9(b) requirement in a liberal manner, requiring a plaintiff to, at a minimum, "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Advocacy Org. for Patients and Providers,* 176 F.3d at 322 (quoting *Coffey v. Foamex L.P.,* 2 F.3d 157, 161–62 (6th Cir.1993)).

## IV. Proposed Conclusions of Law

### A. The Racketeer Influenced and Corrupt Organizations Act (RICO)

Defendants allege that Moore has failed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to state a claim upon which relief may be granted under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO prohibits any person employed by or associated with any enterprise affecting interstate commerce to conduct or participate in the enterprise's affairs "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The purpose of the RICO statute is to combat "organized and/or continuing patterns of criminal activity," and the statute should be read liberally in order to effectuate this purpose. *United States v. Qaoud,* 777 F.2d 1105, 1115 (6th Cir.1985). In order to prove a RICO violation, a plaintiff must establish: 1) two or more predicate offenses; 2) the existence of an enterprise; 3) a pattern of racketeering

activity that bears a sufficient nexus to the enterprise; and 4) an injury to the plaintiff's business or property as a result of the first three elements. *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir.2000).

### 1. Predicate Offenses

The first required element of a RICO claim is the presence of two or more predicate offenses. *VanDenBroeck*, 210 F.3d at 699. "Mail and wire fraud may constitute 'predicate acts' within the meaning of the RICO statute." *Melton v. Bank of Lexington*, 02–1152B, 2009 WL 2971806 (W.D.Tenn.2009). Allegations of mail and wire fraud require a showing of "(1) a scheme to defraud, and (2) use of the mails, or of an interstate electronic communication, respectively, in furtherance of the scheme." *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir.1999) (citing *United States v. Brown*, 147 F.3d 477, 483 (6th Cir.1998)). It is not necessary for a plaintiff to show actual reliance when alleging mail or wire fraud. *United States v. Daniel*, 329 F.3d 480, 486 (6th Cir.2003) (citing *Neder v. U.S.*, 527 U.S. 1, 25, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). In establishing a scheme to defraud by wire, wire communication must "be employed 'for the purpose of executing such scheme or artifice.'" *Daniel*, 329 F.3d at 489 (quoting 18 U.S.C. § 1343). With respect to this element, IAG and Goodfellow argue not only that Moore's Complaint fails to state a claim upon which relief may be granted under Rule 12(b)(6), but further argue that Moore's Complaint does not properly plead the scheme to defraud with particularity as required by Rule 9(b).

Upon review, Moore alleges that IAG and Goodfellow devised a scheme to defraud by selling low quality, over-priced used vehicles to poor and working class African–American residents of Memphis, Tennessee and its surrounding areas through false and misleading advertising and intentionally misleading acts and omissions in sales and service. (Pl.'s Compl. ¶¶ 37, 55). In furtherance of this scheme, Moore alleges that IAG and Goodfellow used television, radio, and internet advertisements featuring Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You." (Pl.'s Compl. ¶¶ 14, 56a). Moore alleges that the use of these advertisements violates 18 U.S.C. § 1343 (fraud by wire, radio, or television) and satisfies the requirement of predicate acts in a RICO claim.

In addition, Moore specifically alleges that Defendants' scheme to defraud intended to "take advantage of the buyer's desperate financial position to impose very unfavorable lending terms, and require that the buyer put down most or all of their savings to purchase an old and typically unreliable vehicle." (Pl.'s Compl. ¶ 37). Moore alleges that the goal of the scheme is "to ultimately deprive buyers of their vehicle so that Defendants' [sic] can resell it from their lot, at the highest down payment possible, and repeat the process again." *Id.* Again, Moore reiterates the necessity of the advertisements in perpetuating the alleged fraud:

> [a]ll Defendants knew the Predatory Lending and Sales Scheme could not have succeeded and/or continued without the use of extensive advertisements through wire, internet, radio, television, and pictures in interstate or foreign commerce for the purpose of transmitting misleading and fraudulent information to prospective customers such as Plaintiff.

(Pl.'s Compl. ¶ 42). Further, Moore claims that these advertisements "were [an] integral part of and essential to the success of the Predatory Lending and Sales Scheme." (Pl.'s Compl. ¶ 41).

Moore also specifically describes her injuries as a result of the Defendants' alleged actions. Specifically, she made a total of $2270 in payments for a vehicle that became inoperable approximately two months after she purchased it, the Defendants did not repair the vehicle, and the vehicle was eventually set to be sold at a public sale. (Pl.'s Compl. ¶¶ 28, 29, 33, 36). The Court recommends that the specificity of Moore's allegations regarding the predicate offenses satisfies Rule 12(b)(6) and the heightened pleading standards required by Rule 9(b).

### 2. Existence of Enterprise

The second required element of a RICO claim is the existence of an enterprise. *VanDenBroeck*, 210 F.3d at 699. "Enterprise" has been defined as "a group of persons associated together for a common purpose of engaging in a course of conduct." *U.S. v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). An enterprise can be a legal entity or "any union or group of individuals associated in fact although not a legal entity." *Id.* at 582, 101 S.Ct. 2524 (quoting 18 U.S.C. § 1961(4)). In order to prove the existence of an association-in-fact enterprise, it must be shown "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity in which it engaged." *VanDenBroeck*, 210 F.3d at 699.

In order to establish that an association-in-fact operated as a "continuing unit," the plaintiff must allege "facts suggesting that the behavior of the listed entities is 'coordinated' in such a way that they function as a 'continuing unit.'" *Begala v. PNC Bank, Ohio, Nat. Ass'n*, 214 F.3d 776, 782 (6th Cir.2000) (citing *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir.1993)). "All that is required is some minimal level of organizational structure between the enti-

ties involved." *VanDenBroeck*, 210 F.3d at 699. Additionally, an association-in-fact enterprise must have "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). Proving "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Id.* at 947, 129 S.Ct. 2237 (quoting *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524).

In the present case, Moore avers that Defendant IAG is a for-profit company formed and operating in Shelby County, Tennessee and that Goodfellow is its founder, principal shareholder, and "actively controls the day to day operations of the business." (Pl.'s Compl. ¶¶ 7–8). Moore also avers that Foley is the general manager and shareholder of IAG. (Pl.'s Compl. ¶ 9). This, Moore has plead that IAG is a legal entity, and Goodfellow and Foley have official responsibilities as shareholders and managers of the entity. Moore alleges sufficient information that there is some minimal organizational structure at IAG, including management, principals, and shareholders, such that there is factual support that IAG is a continuing unit. *Id.* Finally, Moore avers that the existence of the used car dealership itself, which is at its core operating for selling vehicles, is distinct from the alleged pattern of racketeering activity, which allegedly involves the illegal schemes to defraud desperate and financially strained individuals. Accordingly, the Court recommends that the specificity of Moore's allegations regarding the existence of an enterprise satisfies Rule 12(b)(6).

### 3. Pattern of Racketeering Activity

The third requirement in a RICO claim is a "pattern of racketeering activity that

bears a sufficient nexus to the enterprise." *VanDenBroeck,* 210 F.3d at 699. Establishing a pattern of racketeering activity requires a showing of a minimum of two acts of racketeering activity occurring within ten years of one another. *Vild v. Visconsi,* 956 F.2d 560, 565 (6th Cir.1992). The Supreme Court has determined that "[i]n addition to proving the requisite of two predicate acts, a plaintiff must show both a 'relationship between the predicates' and the 'threat of continuing activity.'" *Vild,* 956 F.2d at 565–66 (quoting *H.J. Inc.,* 109 S.Ct. at 2900). "Continuity and relationship constitute two analytically distinct prongs of the pattern requirement." *Id.* at 566.

The required continuity can be "closed-ended," which refers to a "closed period of repeated conduct extending over a substantial period of time," or it can be "open-ended," which refers to past conduct "which by its nature projects into the future with a threat of repetition." *Vemco, Inc. v. Camardella,* 23 F.3d 129, 133–34 (6th Cir.1994) (quoting *H.J. Inc.,* 492 U.S. at 241–42, 109 S.Ct. 2893). Establishing a threat of ongoing repetition "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. In order to establish "relatedness" under a RICO claim, the alleged predicate acts must have "the same or similar purposes, results, participants, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated events." *Id.* at 133 (quoting *Vild,* 956 F.2d at 566).

Moore's Complaint has alleged several acts of racketeering activity that occurred within ten years of one another. Moore has alleged that Defendants intentionally engage in false and misleading advertising, intentionally engage in misleading acts and omissions in sales and service, impose un-

favorable lending terms, and require large down payments for typically unreliable vehicles. (Pl.'s Compl. ¶¶ 37, 40–42). Moore has alleged that the Defendants engaged in an open-ended scheme to defraud her, beginning with her first visit to IAG on or about September 4, 2010.

Moore has alleged one fraudulent scheme that the Defendants participated in. While one scheme does not prevent the finding of a pattern of continuing activity, the presence of only one scheme is an important factor when examining the presence of continuity. *Vemco, Inc.,* 23 F.3d at 134 (citing *U.S. Textiles, Inc. v. Anheuser Busch Cos., Inc.,* 911 F.2d 1261, 1269 (7th Cir.1990)). In *Vemco, Inc.,* the court considered a case involving one victim alleging one fraudulent scheme that took place over a seventeen month period. *Id.* The court held that this did not constitute the type of conduct Congress attempted to prohibit with RICO. *Id.* The Supreme Court has held that continuity may be demonstrated by "proving a series of related predicates extending over a substantial period of time." *H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. Additionally, Defendants have pointed out several cases from other circuits in which periods of time less than twelve months were insufficient to establish continuity. However, while Moore's allegations of fraud only take place over a six month time span (September 2010 to February 2011), she argues that continuity is established because the Defendants' fraudulent scheme is their regular way of doing business. By pleading that this behavior is the Defendants' regular way of doing business, Moore has satisfied the continuity requirement. *See H.J. Inc.,* 492 U.S. at 242, 109 S.Ct. 2893. Moore has plead the "relatedness" element by detailing a scheme comprised of predicate acts that have the same purpose (deprive buyers of their vehicles so the Defendants can resell them and require large

down payments), the same participants (the Defendants), the same victims (poor and working class African–Americans in the Memphis area), and the same methods of communication (allegedly misleading advertisements). Accordingly, the Court recommends that the specificity of Moore's allegations regarding the pattern of racketeering activity satisfies Rule 12(b)(6).

#### 4. Proximate Cause

The final requirement in alleging a RICO violation is a showing of injury to the plaintiff as a result of the first three elements. *VanDenBroeck,* 210 F.3d at 699. The plaintiff must allege that defendant's conduct is the proximate cause of the plaintiff's injuries. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The plaintiff must also allege that the predicate acts were the "substantial and foreseeable cause of the injuries alleged." *Brown v. Cassens Transp. Co.,* 546 F.3d 347, 357 (6th Cir.2008). Additionally, "the scheme to defraud must be targeted at the plaintiff and involve fraudulent misrepresentations made to the plaintiff." *Star Waste Services, LLC v. U.S. Waste, LLC,* No. 1:07–CV–127, 2008 WL 2066442, at *3 (E.D.Tenn.2008).

Moore has specifically described her injuries as a result of the Defendants' alleged actions. Moore paid $1520 for a down payment on a vehicle she was told required a $1000 down payment, she made a total of $2270 in payments for a vehicle that became inoperable approximately two months after she purchased it, the Defendants did not repair the vehicle, and the vehicle was eventually set to be sold at a public sale. (Pl.'s Compl. ¶¶ 28, 29, 33, 36). In determining whether this loss was foreseeable, Moore has alleged that the repossession of the vehicle was part of the Defendants' scheme, making the final result foreseeable. (Pl.'s Compl. ¶ 37). Thus, the Court recommends that Moore's alle-

gations regarding proximate causation satisfies Rule 12(b)(6). Ultimately, the Court recommends that Moore has sufficiently plead each of the required elements in a RICO claim and recommends that the Defendants' Motion to Dismiss this claim pursuant to Rule 12(b)(6) should be denied.

#### B. The Truth in Lending Act and Regulation Z

TILA "was enacted to promote the informed use of credit by consumers by requiring meaningful disclosure of credit terms." *Begala v. PNC Bank, Ohio, Nat. Ass'n,* 163 F.3d 948, 950 (6th Cir.1998). If a creditor "fails to disclose any of the credit terms required under the TILA and its regulations, a consumer may bring a civil action against the creditor." *Purtle v. Eldridge Auto Sales, Inc.,* 91 F.3d 797, 800 (6th Cir.1996). These required disclosures include the amount financed, the principal loan amount, other amounts financed, the APR, the total of payments, and the total sale price. 12 C.F.R. § 226.18. TILA claims "should be given a broad, liberal construction in favor of the consumer." *Begala,* 163 F.3d at 950 (citing *Jones v. The TransOhio Sav. Ass'n,* 747 F.2d 1037, 1040 (6th Cir.1984)). The disclosed APR in a consumer credit transaction is accurate if the disclosed rate is "not greater than one-eighth of 1 per centum more or less than the actual rate or rounded to the nearest one-fourth of 1 per centum." 15 U.S.C.A. § 1606(c).

Moore alleges that the Defendants intentionally failed to provide mandatory TILA disclosures as well as the actual down payment and deferred down payment by purposely misdirecting her attention. (Pl.'s Compl. ¶ 53a). The APR disclosed on the sales contract between Moore and IAG is listed as 26.000%. Moore alleges that the actual APR is 27.961%, which is more than the one-

eighth of 1 per centum as permitted by statute. (Pl.'s Compl. ¶ 53b). Accepting these allegations as true, Moore has stated claims of violations of TILA.

Defendants contend that Moore's claim should be dismissed for failure to attach a copy of the sales agreement to the Complaint; however, the Federal Rules of Civil Procedure do not require Moore to attach a copy of the sales agreement to her Complaint. Additionally, Moore attached a copy of the sales agreement to her Response in Opposition to Defendants' Motion to Dismiss. Furthermore, Moore claims that the Defendants retained a copy of the sales agreement the day Moore signed it, permitting the Defendants to review the sales agreement if necessary. (Pl.'s Compl. ¶ 23).

While Moore has generally pled the appropriate requirements for a TILA claim, she has failed to assert how Goodfellow, individually as a defendant, was involved in the violations of the TILA. Moore's Complaint alleges that she did not interact with Goodfellow until two days after she signed the sales agreement. (Pl.'s Compl. ¶ 27). There is no indication of any TILA violations involving Goodfellow individually. Accordingly, the Court recommends that the TILA claims against Goodfellow individually should be dismissed pursuant to Rule 12(b)(6) but that the claims against IAG should not be dismissed pursuant to Rule 12(b)(6).

## C. Negligent Misrepresentation

In order to establish a claim of negligent misrepresentation, the plaintiff must show as follows:

(1) the defendant is acting in the course of his business, profession or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and (2) the defendant supplies faulty information meant to guide others in their business transaction; and (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and (4) the plaintiff justifiably relies upon the information.

*Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 130 (Tenn.1995) (quoting *John Martin Co., Inc. v. Morse/Diesel, Inc.,* 819 S.W.2d 428, 431 (Tenn.1991)). In proving justifiable reliance, the burden is on the plaintiff "to show that its reliance upon any statements defendants may have made was reasonable." *McNeil v. Nofal,* 185 S.W.3d 402, 409 (Tenn.App.2005) (citing *Metropolitan Government of Nashville and Davidson County v. McKinney,* 852 S.W.2d 233 (Tenn.Ct.App.1992)).

Factors for the court to use in considering a plaintiff's justifiable reliance include "(1) the plaintiff's business expertise and sophistication; (2) the existence of a long-standing business or personal relationship between the parties; (3) the availability of relevant information; (4) the existence of a fiduciary relationship; (5) the concealment of fraud; (6) the opportunity to discover fraud; (7) which party initiated the transaction; and (8) the specificity of the misrepresentation." *Riddle v. Lowe's Home Centers, Inc.,* 802 F.Supp.2d 900, 908 (M.D.Tenn.2011) (citing *Goodall v. Akers,* 2009 WL 528784, *6 (Tenn.Ct.App.2009)).

Moore has made several allegations of Defendants' negligent misrepresentation in the course of selling her a vehicle. Moore's allegations include as follows: the use of misleading television, radio, and internet ads featuring Goodfellow's trademarked phrase, "I Don't Care About Your Credit. I Care About You"; violation of 16 C.F.R. § 455.2 because the vehicle Moore purchased, along with many other vehicles on the IAG lot, did not have a Buyer's Guide on display; bait-and-switch tactics to obtain a higher down-payment from Moore in the sales contract; misdirection of Moore's attention away from the

mandatory truth-in-lending disclosures and other lines in the sales contract regarding the actual down payment and deferred down payment; concealment of the actual down payment by misrepresenting the amount to Moore and later claiming that the higher amount shown on the contract was due to sales tax; and, promising to make repairs to her vehicle after towing it to the IAG lot but never performing the repairs. (Pl.'s Compl. ¶¶ 69a-f).

Upon review, Moore has alleged the first element of negligent misrepresentation by averring that the communications between Moore and Defendants took place as part of the Defendants' course of business—selling used vehicles. Moore has also sufficiently plead the second element because she has alleged that the Defendants intentionally told her that the down payment on the vehicle she purchased was $800 and then later told her that the down payment was $1000. (Pl.'s Compl. ¶¶ 17, 18). The conduct of the Defendants led Moore to believe that she was financing the portion of the $1000 down payment that she could not afford the day she purchased the vehicle; however, Moore was actually charged $1520 for the down payment. (Pl.'s Compl. ¶ 25). These allegations together satisfy the requirement that the Defendants provided faulty information to Moore meant to guide her in the purchase of the car.

Moore alleges that Defendants did not exercise reasonable care in obtaining and communicating the above described information to her, the third element of the *John Martin* test, although she does not expressly identify how the lack of reasonable care took place. However, based on other portions of the Complaint, there is no indication that the Defendants ever explained to Moore that the down payment was actually $1520. Additionally, taking Moore's allegations as true, the Defendants intentionally drew her attention away from the portion of the sales contract containing the down payment, deferred down payment, APR, and total sales price, again leading Moore to believe that she was only paying $1000 for the down payment, hiding the true amount of the down payment. (Pl.'s Compl. ¶ 20).

In order to satisfy the final element of the *John Martin* test, Moore has alleged that she "justifiably relied on the above-described false information supplied by Defendants." (Pl.'s Compl. ¶ 71). Again, Moore has failed to provide further information with this allegation concerning how her reliance was justified. Considering the factors set forth in *Riddle*, Moore's reliance may be justified. It does not appear as though Moore had any expertise in the purchase of used vehicles. Rather, it appears as though Moore went to IAG with a set amount of money she could spend and left it to the Defendants to find a suitable vehicle for her needs. There is no indication of a previous business or personal relationship between the parties.

Despite her lack of experience, the accurate amount of the down payment was on the sales agreement Moore signed. Even if Defendants drew Moore's attention away from the portions of the agreement containing the accurate prices, Moore had the ability to read over those portions of the contract, as she did the following morning, in order to discover the correct prices. This information was not hidden away, impossible for Moore to discover. It was simply on a portion of the sales agreement that was overlooked. Even though the contract contained certain information, Moore also asserts that she relied on the verbal information provided by Defendants to sign the contract, and it is possible that a reasonable jury would find that Moore's failure to read the entire document was reasonable given the circumstances. (Pl.'s Compl. ¶ 22). Accordingly, the Court recommends that Moore's Complaint has sat-

isfactorily plead each of the elements of negligent misrepresentation and recommends Defendants' Motion to Dismiss this claim should be denied.

### D. Conspiracy

Finally, Defendants' move to dismiss Moore's "claim for common law conspiracy" pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Defendants argue that this claim is included in Count III of Moore's Complaint, and they further assert that Moore specifically alleges that Defendants conspired "to obtain money from Plaintiffs" in Paragraphs 55–56.

Upon review of Moore's Complaint, it initially states that her action for damages arises out of various claims, including "fraud, negligent misrepresentation, breach of contract and *conspiracy to commit some or all of the aforementioned torts.*" (Pl.'s Compl. ¶ 1). However, the remainder of Moore's Complaint does not mention any conspiracy or, contrary to Defendants' assertions, any alleged aim of obtaining money from her, including in Paragraphs 55–56. Further, in Moore's Response to the instant Motion, Moore clarifies that she does not "actually claim 'common law conspiracy.'" (Pl.'s Resp. at 17).

It appears to the Court that Moore's reference to conspiracy in the Complaint was either inadvertent or, in any event, not intended to state a claim for conspiracy. As Moore likewise does not make any allegations of conspiracy and agrees that she does not seek to pursue a claim for conspiracy, the Court recommends that IAG and Goodfellow's Motion to Dismiss any claims of conspiracy be granted.

### E. Jurisdiction

Finally, IAG and Goodfellow argue that Moore's Complaint should be dismissed pursuant to Rule 12(b)(1) because this Court does not have proper subject matter jurisdiction. While the Court would normally address any jurisdictional challenges as a threshold matter, IAG and Goodfellow argue specifically that the Court lacks federal question jurisdiction over the RICO and TILA claims because Moore's Complaint failed to state claims upon which relief may be granted pursuant to Rule 12(b)(6). The Court has recommended that Moore's Complaint does not fail to state these federal statutory claims. Accordingly, the Court recommends that the Court has proper federal question jurisdiction over the RICO and TILA claims.

IAG and Goodfellow further argued that, if the Court did not have federal question jurisdiction over the RICO and TILA claims, it had no basis for exercising supplemental jurisdiction over the state law claims. However, the Court has recommended that the Court does have federal jurisdiction over the RICO and TILA claims. Under 28 U.S.C. § 1367(a), a federal court has supplemental jurisdiction over "all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). IAG and Goodfellow do not raise any argument that the state law claims do not form part of the same case or controversy for purposes of supplemental jurisdiction, and Moore does not address this requirement. However, the Court recommends that the state law claims regarding IAG and Goodfellow's advertising to the general public and conduct regarding the transactions with Moore are part of the same case and controversy appropriate for the Court to exercise supplemental jurisdiction.

### V. Conclusion

For the reasons set forth herein, the Court RECOMMENDS Goodfellow and IAG's Motion to Dismiss be GRANTED in

part and DENIED in part. The Court RECOMMENDS that jurisdiction is proper, that Moore's RICO claim should not be dismissed as to IAG and Goodfellow, that Moore's TILA claim should not be dismissed as to IAG but should be dismissed as to Goodfellow in his individual capacity, that Moore's claim for negligent misrepresentation should not be dismissed as to IAG and Goodfellow, and that Moore's purported claim for conspiracy should be dismissed as to IAG and Goodfellow.